[Civ. No. 15462.   First Dist., Div. One.   Aug. 21, 1953.]

EDWARD L. KELLY, Respondent, v. DAVID D. BOHANNON ORGANIZATION (a Corporation), Appellant.

Bullock, Wagstaffe & Daba for Appellant.

Hancock, Elkington & Rothert for Respondent.

WOOD (Fred B.), J.—Defendant David D. Bohannon organization, a corporation, has appealed from a judgment against it in the sum of $5,642.72 as the balance due for services rendered by the plaintiff.

Defendant presents three questions: (1) Illegality of contract, (2) Full accord and satisfaction, and (3) Partial accord and satisfaction.

(1) *Was plaintiff unlawfully using the title "professional engineer" and thereby precluded from recovering for engineering services?*

Defendant's claim is predicated upon a statute enacted in 1947 (Stats. 1947, ch. 1468, p. 3045), effective September 19, 1947, which amended the Civil Engineers' Act by adding article 8 (Bus. & Prof. Code, §§ 6800-6814) for the "regula-

tion of professional engineers in the branches of chemical, electrical, mechanical and petroleum engineering'' (§ 6800).

This statute provided for registration, without examination, of any person who possessed certain minimum qualifications, including six years of experience (§§ 6804 and 6805), if he applied to the State Board of Registration of Civil and Professional Engineers on or before June 30, 1948. The board would have ''a reasonable time after June 30, 1948, to process all applications,'' (§ 6803). Later applicants would have to take an examination to establish their eligibility for registration.

The statute declared it unlawful for any person to use the title ''professional engineer,'' ''mechanical engineer,'' or ''electrical engineer,'' unless registered (§§ 6802, 6812, 6813), and prescribed a misdemeanor penalty (§ 6787).

It did not in terms make it unlawful for an unregistered person to practice professional engineering;[1] nor did it in terms declare illegal a contract for mechanical or electrical engineering services performed by an unregistered person. By implication only, could we arrive at any such intended proscription.

When this statute took effect plaintiff had had about twenty years of engineering experience (4 years study followed by 18 years of practice), in part mechanical and in part electrical. He applied for registration in each of those branches. In November, 1947, the state board acknowledged receipt of his application. In its letters to plaintiff transmitting these receipts, the board said in part: ''It is anticipated that several thousand applications will be received within the next few weeks; therefore, please be patient; as it takes on an average of thirty days after an application is processed before it is ready for board action. Since the board does not meet regularly, but only when the volume of business justifies, it may be *several months* before you are advised of the board's action.''

A certificate of registration in mechanical engineering was issued to plaintiff on January 3, 1949, retroactively as of June 30, 1948, expiring June 30, 1948, the end of the first fiscal year under the new registration statute. Thereafter

---

[1] In contrast, *in respect to civil engineering,* the very act of which the professional engineering article became a part, made it unlawul ''to practice or offer to practice as a civil engineer . . . , unless . . . duly registered . . . or specifically exempted'' from registration as a civil engineer. (Bus. & Prof. Code, §§ 6730 and 6795.)

his registration would be evidenced by an annual renewal certificate.[2]

His electrical engineering application was not granted. In late May or early June of 1948, he received notice of unfavorable action but the application was the subject of further proceedings before the board, continuing into the year 1950. Even if the May or June, 1948, denial had been final, it would not in itself alone operate retroactively to invalidate the contract made in April, 1948.

Meanwhile, the services in question were contracted for and rendered during the period April to June, inclusive, 1948.

The asserted illegal use of the title professional engineer (in mechanical and electrical engineering) consisted of plaintiff's use, on his letterhead, of the designation "Edward L. Kelly · Professional Engineer · Mechanical and Electrical," and his signing his offer of contract with defendant over the typed designation "Edward Kelly, Professional Engineer."[3]

We cannot ascribe to the Legislature an intent by this statute to declare illegal and unenforceable a contract for the rendition of mechanical and electrical engineering services executed and performed during the period of time and under the circumstances here disclosed.

The blanketing in of persons already engaged and experienced in this line of work, allowing them nearly 9½ months (September 19 to June 30) within which to apply, and the board an indefinite period of time thereafter within which to process the applications, indicates no legislative intent to prohibit plaintiff (during the pendency of his applications for registration) from using the titled "professional engineer," "mechanical engineer," "electrical engineer," or from practicing either of those branches.[4] In the absence of such a prohibition no illegality attached to the contract in suit.

[2]The statute provided for annual renewal upon payment of a $6.00 renewal fee; if delinquent $5.00 additional per month of delay in payment. (See §§ 6811 and 6799.)

[3]There is no suggestion that he came to defendant under any false colors or that a belief that he was registered was an inducement to defendant in making the contract with him. Indeed, one of defendant's representatives, formerly associated with plaintiff in government work, invited him to make an offer, the offer which was accepted.

[4]Perhaps the statute did not under any circumstances prohibit an unregistered person from "practicing" as a mechanical or as an electrical engineer; a question we need not and do not decide.

The judicial decisions invoked by defendant are inapplicable.

In *Orlinoff* v. *Campbell*, 91 Cal.App.2d 382 [205 P.2d 67], the court construed and applied certain of the provisions of chapter 223 of the statutes of 1935, page 878, which provided for the regulation of highway carriers. As enacted, section 3 of the statute prohibited, with certain exceptions, any highway carrier other than a common carrier from engaging in the business without first obtaining a permit. A highway carrier in business on the effective date of the act was to file its application within 30 days. "Pending the issuance of any permit . . ., the continuance of such operation shall be lawful." (Stats. 1935, p. 879, § 3.) The clause just quoted having served its purpose, was deleted at the next legislative session. (Stats. 1937, ch. 722, p. 2006, 2008.) The Orlinoff case, decided in 1949, involved a contract for transportation of goods by a highway carrier who held no permit to operate as such. We do not know the date of execution of the contract but there is every indication it was not entered into by a person who was in business when the act took effect in 1935 and while his application for a permit was still pending before the Railroad Commission. That case, obviously, bears no analogy to our case.

The other cases cited by defendant likewise have no similarity to our case: *Levinson* v. *Boss*, 150 Cal. 185 [88 P. 825, 11 Ann.Cas. 661, 12 L.R.A.N.S. 575], pawnbroker, doing business without a regulatory license; *Wood* v. *Krepps*, 168 Cal. 382 [143 P. 691, L.R.A. 1915B 851], money lending without paying revenue license fees, not illegal; *Payne* v. *De Vaughn*, 77 Cal.App. 399 [246 P. 1069], contract to render architectural services by unlicensed architect, under a statute which prohibited practice without a license.

We find no basis for holding illegal the contract here involved.

(2) *Did the parties effect an accord and satisfaction which prevented plaintiff from pursuing such right of recovery as he might otherwise have had?*

Defendant's payments on account were made by check. The last check of the series (dated June 23, 1948, payable to plaintiff in the sum of $2,360) bore this statement upon the back: "Payment in full for mechanical and electrical plans and specifications. Project No. 121-42013." Plaintiff endorsed and cashed the check that same day, June 23d.

This is the "accord and satisfaction" claimed by defendant.

If this was an agreement and this the whole of it, defendant's position would be tenable if the production of the plans and specifications represented all of the work in question.

"An accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled" (Civ. Code, § 1521); "Acceptance, by the creditor, of the consideration of an accord extinguishes the obligation, and is called satisfaction" (§ 1523); "Part performance of an obligation . . . where expressly accepted by the creditor, in writing, in satisfaction, or rendered in pursuance of an agreement in writing for that purpose, though without any new consideration, extinguishes the obligation" (§ 1524).

" 'The elements of an accord are: (1) a proper subject matter; (2) competent parties; (3) consent or meeting of the minds of the parties; and (4) consideration.' " (*Gibbons* v. *Brewster,* 82 Cal.App.2d 435, 442 [186 P.2d 459], quoting from *Moore* v. *Bartholomae Corp.,* 69 Cal.App.2d 474, 478 [159 P.2d 436].)

An accord and satisfaction must be predicated upon a bona fide dispute, a real dispute. "An arbitrary refusal to pay, based on the mere pretense of the debtor, made for the obvious purpose of exacting terms which are inequitable and oppressive, is not such a dispute as will satisfy the requirements of the rule." (*Berger* v. *Lane,* 190 Cal. 443, 448 [213 P. 45].) " 'A person cannot create a dispute sufficient as a consideration for a compromise by a mere refusal to pay an undisputed claim. That would be extortion, and not compromise. There must in fact be a dispute or doubt as to the rights of the parties honestly entertained.' " (Same, p. 451, quoting from a Minnesota case.)

One of the triable issues of fact in *D. E. Sanford Co.* v. *Cory Glass etc. Co.,* 85 Cal.App.2d 724, 729 [194 P.2d 127], was the question whether or not there was a "bona fide dispute respecting an *amount* due." In *Stub* v. *Belmont,* 20 Cal.2d 208 [124 P.2d 826], one of the reasons for reversal of a judgment upon the pleadings was the fact that the pleadings showed there was a "bona fide dispute" as to a certain claim for $2,000 (p. 218). For the "principle of accord and satisfaction to apply in disposition of an unliquidated claim, there must be a 'bona fide dispute' between the parties . . ." (*Potter* v. *Pacific Coast Lbr. Co.,* 37 Cal.2d 592, 597 [234 P.2d 16], quoted in *Grayhill Drilling Co.* v. *Superior Oil Co.,* 39 Cal.2d 751, 753 [249 P.2d 21].)

In our case there is evidence sufficient to support an implied finding of the jury that there was no bona fide dispute to serve as a basis for an accord and satisfaction.

The contract for plaintiff's services was executed about April 4, 1948. Those services included "all phases of mechanical and electrical engineering, specification writing, testing, field work, utility negotiations, drafting, and other related services as necessary" for a building project of approximately 500 dwelling units. Payment was to be made upon the basis of $1.50 to $2.50 per hour for drafting and related work; $3.00 per hour mechanical, electrical, and civil engineering work; $3.50 per hour for plaintiff's time; 125 per cent of salaries, for overhead; blue printing and unusual long distance phone calls, at cost; personal automobile travel expense, at 6 cents per mile; travel by other means, at cost; payments to be made on estimated 60 per cent of total due every 30 days unless otherwise arranged.

Plaintiff testified that he commenced work immediately. He proceeded to inspect the site and orient himself to the project's need in the way of utilities. He made preliminary sketches, entered into negotiations with utility companies regarding the needs, rates and facilities for such a project. The discussions relative to gas, sewer and electrical lines were quite detailed and elaborate. The work on preliminary plans was not started until two weeks after he took the job. At the outset, he was not told when the work was to be finished; "they said possibly some time away—six months or a year, perhaps." On May 3rd he was told to make as much speed as humanly possible, to hire extra men so they would not lose a commitment that the F.H.A. had made. He was not informed of any deadline until May 5th, when he was told the exterior utility plans had to be in by about June 12th. He protested that the results of such a procedure would be uncertain and costly. They said a few thousand dollars would not make any material difference.

June 4th he was told to bring to defendant's office whatever work he had done on the utility plans and building plans. He responded that those plans were not final but were in "the status of progressing and to some extent have not been checked," but was told to bring the tracings which he did on June 6th. Defendant's manager said they were in pretty good order, but plaintiff protested they should be checked further and wanted the right to make corrections before treating them as final plans. He testified that changes had been made every

two or three days in the architectural and landscape plans which affected his work because he had to know such things as whether a sewer line was going under a tree or a paved area in order to lay out the utility lines.

Meanwhile, May 17th, plaintiff submitted a statement of, and was paid, his costs for April. June 17th he submitted statements for May 1st to 15th, $4,706.32, and for May 15th to 31st, $2,162.08, but they did not cover all the work done in May, nor for work done in June.

On June 23rd plaintiff was called to the office of the project manager who said he was not completely satisfied with the plans and was going to let plaintiff go. Plaintiff called the manager's attention to the circumstances under which he had worked (the frequent changes they had made, over which he had no control) and said, "I don't think that is justified. I have worked hours and hours and hours, and I don't feel that is justified to let me go on that kind of a basis, near the end—three-quarters of the way through a project." Continuing, plaintiff testified the manager said, "Take it or leave it . . . We are going to pay you off;" and "it won't be very much." Plaintiff replied, "Well, I have spent this money for my help. I owe them several thousand dollars on this payroll, and I will have to have the amount of money that is owing me." The manager responded, "If you are going to have the amount of money owing you, you are going to have to fix me up. You are going to have to give me a kick-back," and "I can fix this up, but you are going to have to fix me up." Plaintiff replied, "I won't do it." The manager left the room, came back with the $2,360 check and said, "Here are your payments for the out of pocket expenses for your help." The plaintiff replied, "I am going to have to cash this check to pay my help, to pay part of the help, but I am not accepting this as a payment in full." The manager replied, "Well, it says on there 'Payment in full for plans and specifications,'" and plaintiff responded, "There is lots of other work that has been done," and "I spent day after day here, and in my own offices, coordinating the work, and I get nothing for my expenses at all;" also, "I am not accepting this in full, I am cashing it, but I am not accepting it in full. I am coming back for the rest."

Plaintiff cashed the check later that day and subsequently rendered bills in the sum of $5,642.72, as the amount which he claimed remained due and unpaid.

Defendant's manager gave a different version of the conversation of June 23d; also, his testimony and that of other witnesses produced by the defendant differed from certain other portions of plaintiff's testimony. That produced a conflict which, of course, it was the function of the jury to resolve, and for the trial court upon motion for new trial to consider. It is not the function of a reviewing court to disturb the determinations made by the jury in rendering its verdict and the trial court in denying a new trial, upon this issue of fact in this case.

In view of the substantial evidence that there was no bona fide dispute, the implied finding that the parties did not effect an accord and satisfaction can not be disturbed.

We observe, also, the evidence indicates that plaintiff rendered extensive services over and above those involved in the production of the "plans and specifications" for which the $2,360 check recited it was payment in full. Yet, defendant did not plead accord and satisfaction of claims due for "plans and specifications"; instead, it pleaded satisfaction "in full of all claims" of plaintiff against defendant.

■ (3) *Did the parties effect an accord and satisfaction of plaintiff's claims for moneys due for preparation of the plans and specifications?*

Defendant asserts that if it did not prove accord and satisfaction of all of plaintiff's claims, it did so in respect to those which pertained to the preparation of the plans and specifications.

In the first place, defendant pleaded full, not partial accord and satisfaction. In the second place, defendant has not directed our attention to any segregation of costs as between the preparation of plans and specifications and other services rendered, nor have we discovered any. The burden of showing such a segregation would seem to rest upon the party urging such a point.

Finally, even if an accord and satisfaction in respect to the plans and specifications had been pleaded and if the costs pertaining to their preparation had been segregated, the asserted partial accord and satisfaction would fail because of the lack of a bona fide dispute to serve as a foundation for it.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.