[Civ. No. 33406. Second Dist., Div. Three. Mar. 11, 1970.]

ARNOLD CLEJAN et al., Plaintiffs and Appellants, v.
SAMUEL REISMAN, Defendant and Appellant.

## COUNSEL

Schwartz & Alschuler, Benjamin F. Schwartz, Herbert A. Karzer and Irving L. Halpern for Plaintiffs and Appellants.

Ball, Hunt, Hart & Brown, Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Joseph D. Mullender, Jr., and Frederic G. Marks for Defendant and Appellant.

## OPINION

**SCHWEITZER, J.**—Action by plaintiffs on a contract for the sale by plaintiffs to defendants of 350 shares of the capital stock of Gamble Ranch Investments, Inc.

Plaintiffs Arnold Clejan and Katherine Clejan, husband and wife, are the respondents and cross-appellants herein. Defendants Joe Benaron and J. J. Byrnes entered into a settlement with plaintiffs before trial and are no longer parties to this action. The remaining defendant, Samuel Reisman, is the appellant and cross-respondent herein.

Because of defendant Reisman's contentions that various transactions were in violation of the Corporate Securities Law and that the stock sold by the contract was therefore void, a detailed chronology of the facts behind the contract is necessary. In May 1959 plaintiff Arnold Clejan agreed to buy for $2,500,000 the Gamble Ranch, some 236,000 acres located in Nevada and Utah, with annexed grazing rights of approximately 370,000 acres. It was his intention to subdivide and sell parcels of the land. Terms of sale were a cash down payment of $70,000, the assumption of an indebtedness on the property of approximately $230,000, the execution of a promissory note to the seller in the sum of $1,973,000 and the payment of a portion of the real estate brokers' commissions. Two California residents, Omansky and Klein, advanced Clejan $50,000, and another California resident, Rosenberg, advanced him $20,000 to make the $70,000 down payment. Clejan, Omansky and Klein agreed that Clejan was to own one-half of the venture and was to manage the subdividing and sale of the property; Omansky and Klein were each to own one-quarter interests.

It developed thereafter that Clejan needed additional capital to obtain a deed to the land and to establish a real estate office from which he could sell the land as it was subdivided. During June and July 1959 he solicited and obtained a total of $85,000 from nine California residents, including an additional $5,000 from Rosenberg, in return for which he delivered to each a document denoted as an escrow agreement which purportedly transferred to each undescribed interests in the Gamble Ranch on the basis of 1 percent of the property for each $5,000 invested. At trial Clejan and five of the nine investors testified that their original agreement was for the purchase and sale of land, that nothing was said about stock, and that the reason for their investment was an expectation of profit upon resale of the land by Clejan. Only one investor testified that the agreement involved the sale of stock.

Sometime in July 1959 Clejan entered into an agreement with Omansky

and Klein to purchase their interest in the venture for the amount of their initial $50,000 investment. He gave them a down payment of $15,000.

On August 13, 1959 Clejan formed a Nevada corporation, known as Gamble Ranch Investment, Inc., with himself, his wife and Rosenberg as directors. Clejan was elected president at the August 31, 1959 organizational meeting and by resolution was given full authority to act for the corporation on all corporate affairs without prior approval of the board of directors. At the meeting Clejan announced his intent to convey a 90 percent interest in the property to the corporation in return for 900 shares of corporate stock and the assumption by the corporation of Clejan's obligations. At the same meeting Clejan announced that he intended to sell a 5 percent undivided interest in the land to defendant Benaron and a 5 percent interest to defendant Byrnes for a total price of $50,000, and that he was retaining 10 percent of the property for this possible sale. It was Clejan's intention to use $35,000 of the $50,00 to be received from Benaron and Byrnes to pay Omansky and Klein the balance due them.

On September 9, 1959 Clejan entered into a contract with Benaron and Byrnes under which they paid him $50,000 for the 10 percent interest in the property and further agreed that if a corporation were formed, they would convey their 10 percent interest to the corporation in return for the issuance to each of 50 shares of stock in the corporation. It should be noted that the corporation had been organized prior to the date of this agreement, but that Clejan apparently did not so advise Benaron and Byrnes. Defendant Reisman served as Benaron's attorney in connection with this transaction. From the $50,000 received from Benaron and Byrnes, Clejan paid Omansky and Klein the $35,000 balance due them.

In November 1959, 900 shares of stock were issued and delivered in Nevada to plaintiffs for their 90 percent interest in the ranch. In December 1959 certificates for 50 shares each to Benaron and Byrnes were delivered to Reisman in Nevada for Benaron and Byrnes in exchange for their 10 percent interest in the property.

Friction developed between plaintiffs and the nine investors. To settle their disagreement, Clejan offered the nine investors a gift of 170 shares of stock from his 900-share holding, two shares for each $1,000 invested. Each, except Rosenberg, demanded a return of his money in lieu of stock. Since this factor as well as others presented a financial crisis, Clejan entered into an agreement with Benaron whereby Benaron loaned the corporation on December 7, 1959 approximately $100,000 in return for the transfer to him by the Clejans of 365 of their 900 shares. Each of the nine California investors, except Rosenberg, was thereupon repaid the amount of his investment. Fifty shares from the 170 shares set aside for these investors were

transferred to Rosenberg, whose investment totalled $25,000, and at a later date 100 shares were transferred to Benaron and 20 shares were transferred to his attorney, Reisman, defendant-appellant herein. These stock transactions reduced plaintiffs' holdings to 365 shares.

At a directors' meeting held in Nevada on December 6, 1959 plaintiffs were ousted as directors and officers of the corporation. Defendants Byrnes and Benaron were elected directors, defendant Reisman, their attorney, was elected president, and thereafter defendants were in control of the corporation.

In April 1960 plaintiffs conveyed 15 of their remaining 365 shares to their attorney, leaving them with a total of 350 shares.

On December 23, 1960, Reisman and Byrnes entered into an agreement in California with plaintiffs whereby Reisman and Byrnes agreed to purchase the 350 remaining shares held by plaintiffs for the sum of $250,000 to be paid in stated instalments over a period of years.

After several defaults in payments under this contract, on February 1, 1963, the parties entered into an agreement in California providing that as of January 31, 1963, there was due plaintiffs under the December 23, 1960 agreement $149,845.50; that defendants have no defense thereto and that plaintiffs are entitled to payment thereof; that defendants would pay Clejan $35,000 forthwith and the balance of $114,845.50 together with 6 percent interest per annum on January 15, 1964; that as of January 15, 1964, the total principal and interest due the Clejans would be $121,454; that the Clejans would accept land from Gamble Ranch Investments, Inc. in lieu of cash on January 15, 1964, at the agreed price of $12 per acre, a total of 10,121 acres, in full payment of the obligation; and that in the event suit be brought on the agreement, the successful party would be entitled to reasonable attorneys' fees. Benaron had not been a party to the December 23, 1960 agreement. By the February 1, 1963, agreement he agreed to be bound by the December 23, 1960, contract "to the same extent as though he were a principal thereof and had executed the agreement of December 23, 1960, as such principal."

It should be noted that as of February 1, 1963, title to the real property was in the corporation, that the defendants were officers, directors and majority stockholders thereof, and that by providing in the February 1, 1963, agreement that they would convey 10,121 acres of the corporate real estate to plaintiffs on January 15, 1964 in full payment of their personal obligation to plaintiffs, they were considering the corporation as their *alter ego*.

The present action is the result of an alleged default by defendants under the December 23, 1960, and February 1, 1963, agreements.

Defendant Reisman contends that plaintiffs organized the corporation as a speculative scheme to acquire land for resale to the public; that the venture was financed by soliciting the nine California investors for money; that these persons were "passive investors" and received in return "securities" within the meaning of the Corporate Securities Law; that the "securities" were sold in California without a permit of the Corporation Commissioner pursuant to a scheme to evade the Corporate Securities Law; that as a result all of the stock thereafter issued, including the 350 shares sold defendants under the December 23, 1960, agreement, was void; that as a result, the agreement was voidable at the option of defendants; and that defendant Reisman is entitled to recover the sum of $36,859.83 previously paid by him to plaintiffs in part performance of the contract because issuance and sale of the stock without a permit breached an implied warranty that the stock had been validly issued to plaintiffs. Defendant Reisman prayed that plaintiffs take nothing by their complaint and that he have judgment on his cross-complaint for the $36,859.83.

Plaintiffs deny these contentions and argue that even if the interests sold the nine California investors were "securities" within the meaning of the Corporate Securities Law, the stock issued thereafter to plaintiffs in Nevada by the Nevada corporation was valid under Nevada law and was not subject to the Corporate Securities Law; that even if it came under the Corporate Securities Law, the sale of the stock was specifically exempted from the Law as a sale of "personally owned" stock, not made for the issuer of a security or as a part of a promotional scheme created for the purpose of evading the Corporate Securities Law; that even if the stock were void for lack of a permit, because defendant Reisman was aware at all times of the circumstances surrounding the issuance of the stock, he should be estopped from denying its validity, and if not, he should be denied any recovery on his cross-complaint on the ground that he was *in pari delicto*.

Trial was by the court sitting without a jury. The court found for plaintiffs on the complaint and against defendant Reisman on the cross-complaint and rendered judgment for plaintiffs in the sum of $40,759.27, the unpaid balance due under the February 1, 1963, agreement, together with interest thereon, and awarded plaintiffs' attorneys' fees in the sum of $3,000. Defendant Reisman appeals from the entire judgment; plaintiffs appeal from that portion of the judgment awarding them $3,000 attorneys' fees, asserting that the award was inadequate.

In reaching its decision, the trial court concluded that Gamble Ranch Investments, Inc. was a bona fide Nevada corporation; that the sale and

issuance of 900 shares of its stock to plaintiffs was a valid bona fide transaction, supported by a valuable consideration, occurred entirely within the State of Nevada and was therefore not subject to the California Corporate Securities Law; that plaintiffs did not sell the stock for the direct or indirect benefit of the corporation or any underwriter, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading the Corporate Securities Law; that the conveyance of the stock by plaintiffs was exempt from the Corporate Securities Law; that the contracts with the nine investors were unenforceable because of the failure to describe the specific acres each was to acquire; that since the contracts were unenforceable, each had only a right to the return of his money; that plaintiffs' intent to transfer 170 shares of their 900 shares to the nine investors did not invalidate the issuance of the remaining 730 shares to plaintiffs and the subsequent transfer of their remaining shares to Reisman, Benaron and Byrnes; that Reisman, Benaron and Byrnes purchased valid shares and no permit of the Corporation Commissioner was required for their transfer; that Reisman took an active part in formulating the plans and procedures for the issuance of the stock to plaintiffs and is therefore estopped from questioning the validity of that stock; that the plaintiffs were not joint venturers or partners with the nine investors; that the nine investors had no claim or legal right at any time to any of plaintiffs' stock; that plaintiffs had the sole legal title to the stock at the time of issuance, and had legal title to the Gamble Ranch property at the time the corporation was organized, subject to encumbrances and the rights of the nine investors; that the December 23, 1960, agreement and the February 1, 1963, extension agreement were valid and enforceable, and without a defense.

Defendant Reisman points out that the facts are for the most part undisputed and calls our attention to the recent statement of our Supreme Court in *Morrison* v. *State Board of Education,* 1 Cal.3d 214, 238 [82 Cal.Rptr. 175, 461 P.2d 175]: "In any event, 'the ultimate conclusion to be drawn from undisputed facts is a question of law for an appellate court [citations].' " We do not question this statement but note a more complete statement of the applicable rule in *Tobola* v. *Wholey,* 75 Cal.App.2d 351, 355 [170 P.2d 952]: "Appellant's view of the situation fails to take into account the rule that even where the probative facts are undisputed, the question as to the inferences to be drawn therefrom is still within the exclusive province of the trial court, and if there is any substantial evidence to support them this court is bound by the determination of the trial court. In other words, it is just as much the function of the trial court to resolve a conflict between opposing inferences as it is to resolve a conflict between contradictory statements of fact."

## Validity of Transactions With Nine California Investors

Since the Corporate Securities Law relates primarily to the sale of securities and the licensing of persons selling securities, its scope depends to a great extent upon the meaning of the term "security." Section 25008, Corporations Code[1] provided in pertinent part:

" 'Security' includes all of the following:

"(a) Any stock . . . ; any certificate of interest or participation; any certificate of interest in a profit-sharing agreement; any certificate of interest in an oil, gas, or mining title or lease; any transferable share. investment contract, or beneficial interest in title to property. profits or earnings."

■ The use of the word "includes" in the statutory definition suggests that the items mentioned were intended to be illustrative and that the law was intended to embrace unnamed items similar to those listed. Thus the courts in examining an instrument of indebtedness have sought to determine whether the instrument seemed to perform the function stocks or bonds would have performed if the venture had been organized in a conventional manner. ■ The regulatory purpose of the law is not to be "vitiated by inventive substitutes for conventional means of raising risk capital." (*Silver Hills Country Club* v. *Sobieski,* 55 Cal.2d 811, 816 [13 Cal.Rptr. 186. 361 P.2d 906, 87 A.L.R.2d 1135].) On page 814. the court added that courts must "look through form to substance."

In *Silver Hills Country Club, supra,* promoters were in possession of a small ranch under a contract to purchase it for $75,000 and had made only a $400 down payment thereon. They proposed to raise $165,000 through the sale of "memberships" and to construct facilities for the use of the members. Memberships were to be transferable only to persons approved by the club's board of directors, were to be subject to payment of dues. and were to convey no rights in the income or assets of the club. In upholding the Commissioner of Corporations' conclusion that the membership interests were a "security" and that the sales thereof without a permit were prohibited by the Corporate Securities Law. the court noted that since the sale of the memberships was not underwritten, there was no assurance that funds sufficient to construct the promised facilities, or even to pay the balance of the purchase price on the ranch, would be raised; that the $400 down payment of the promoters was an insignificant sum compared to the undertaking; that if the venture failed. nearly all the money lost would be that supplied by the public; that the promoters were "soliciting the risk capital with which to develop a business for profit" (55 Cal.2d at p. 815); that the memberships appeared to be performing the function ordinarily performed by shares of

---

[1]Repealed 1968 and now incorporated in Corporations Code section 25019.

stock; and that the objective of the law "is to afford those who risk their capital at least a fair chance of realizing their objectives in legitimate ventures whether or not they expect a return on their capital in one form or another." (55 Cal.2d at p. 815.)

The court in *Silver Hills Country Club, supra* (55 Cal.2d at p. 814) noted that "security" has been defined "broadly to protect the public against spurious schemes, however ingeniously devised, to attract risk capital," and stated on page 815: " 'as a general rule, the sale of "securities" that is condemned by the courts involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money.' (Dahlquist, *Regulation and Civil Liability Under the California Securities Act* . . . 33 Cal. L. Rev. 343, 360.)"

Illustrations of similar transactions held to be "securities" within the meaning of the Corporate Securities Law are found in *Hollywood State Bank* v. *Wilde,* 70 Cal.App.2d 103, 107 [160 P.2d 846] (sale of fur-bearing animals and the entrusting of those animals to the seller for care and disposition of the fur); *Oil Lease Service, Inc.* v. *Stephenson,* 162 Cal.App.2d 100, 107-108 [327 P.2d 628] (the selling of "services" in procuring oil leases); *Securities & Exchange Com.* v. *W. J. Howey Co.,* 328 U.S. 293, 298 [90 L.Ed. 1244, 1249, 66 S.Ct. 1100, 163 A.L.R. 1043] (the sale of orange groves coupled with a contract to have the vendor service the land); *People* v. *Sidwell,* 27 Cal.2d 121 [162 P.2d 913] (beneficial interest in oil lease and drilling operations); *Mary Pickford Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501 [86 P.2d 102] (beneficial interest in trust formed to develop land); and *Menke* v. *Rand Min. Co.,* 81 Cal.App.2d 169 [183 P.2d 755] (agreement to pay share of profits from mining venture).

In the instant case the trial court made no finding as to whether the contracts with the nine investors involved sales of "securities" within the meaning of the Corporate Securities Law. It did find that each was a sale of an "interest in land," and specifically found that the contracts were unenforceable because of the failure to describe the acreage involved. (*Craig* v. *Zelian,* 137 Cal. 105 [69 P. 853].)

■ The facts surrounding these several transactions come squarely within the holding of the Supreme Court in *Silver Hills Country Club, supra,* 55 Cal.2d 811. They were sales of profit sharing interests in a business venture. The agreements attempted to perform the function stock would have performed if the venture had been organized in a conventional manner. The agreements were the result of the solicitation of risk capital to develop a business for profit. Plaintiffs, the promoters, contributed no capital, yet they

retained full control over the management and destiny of the promotion and intended to receive, and ultimately did receive a majority of stock in the corporation. Each contributor was a passive investor at most. Each received a "security" within the meaning of the Corporate Securities Law.

"Sale" is broadly defined by the Corporate Securities Law to include "every disposition . . . of a security for value" and includes: "An offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale; a taking of a subscription; an exchange; . . ." (Corp. Code, § 25009.[2]) The uncontroverted facts support the conclusion that each transaction constituted a "sale" within the meaning of the Law.

The law defines the word "company" as including individuals (Corp. Code, § 25003[3]), and provided that no "company" shall sell, offer for sale or negotiate for sale of a security of its own issue until it has obtained a permit from the Corporation Commissioner (Corp. Code, § 25500[4]), and that every security of its own issue sold by any "company" without such permit is void. (Corp. Code, § 26100[5]; but see: *Eberhard* v. *Pacific Southwest Loan & Mortg. Corp.*, 215 Cal. 226 [9 P.2d 302], holding that a security sold without a permit is voidable at the "behest of the purchaser.") Plaintiffs, acting as individuals in the promotion before incorporation, were therefore subject to the law.

We conclude that plaintiffs' transactions with the nine investors in California constituted sales of securities within the meaning of the Corporate Securities Law, and that the interests sold were void as having been made without a permit.

### Effect on Stock Subsequently Issued and Sold

Defendant argues that since the 900 shares were "promotional stock" acquired by plaintiffs as an indirect result of the purchase of the property by money raised through the foregoing illegal sales of "securities" in California without a permit, the stock, including the shares sold Reisman was void (Corp. Code, § 26100), or at least voidable at the instance of the purchasers. (*Eberhard* v. *Pacific Southwest Loan & Mortg. Corp., supra,* 215 Cal. 226.) Defendant's argument is supported by an impassioned reference to the fact that Clejan acquired this stock without investment of any of his own money. We do not agree with this contention.

■ (1) *Prior Illegal Transactions Will Not Invalidate Subsequently*

---

[2]Repealed 1968 and now incorporated in Corporations Code, section 25017.
[3]Repealed 1968.
[4]Repealed 1968 and now incorporated in Corporations Code, section 25110.
[5]Repealed 1968.

*Issued Stock.* Defendant relies on *Wells* v. *Comstock,* 46 Cal.2d 528, 531 [297 P.2d 961] (stock sold contrary to permit held void and contract for sales price unenforceable), *Duntley* v. *Kagarise,* 10 Cal.App.2d 394, 397 [52 P.2d 560] (escrowed stock sold contrary to permit was void and seller's recovery of purchase price denied), *Boss* v. *Silent Drama Syndicate,* 82 Cal.App. 109, 113 [255 P. 225] (subsequent receipt of permit will not validate prior sale of stock void for lack of permit), *Reed* v. *Norman,* 41 Cal.2d 17 [256 P.2d 930] (stock sold contrary to permit held void), *Perego* v. *Seymour,* 196 Cal.App.2d 773 [16 Cal.Rptr. 831] (broker's commission denied for sale of stock sold contrary to permit), and *Stonehocker* v. *Cassano,* 154 Cal.App.2d 732 [316 P.2d 717] (stock sold contrary to permit held void). These cases are not in point. Each involved a particular transaction. None held that all subsequent independent transactions are invalidated by the illegal prior transaction.

It has been held that obligors on subsequent transactions cannot take advantage of a prior illegal transaction. Thus in *N. C. Roberts Co.* v. *Topaz Transformer Products, Inc.,* 239 Cal.App.2d 801 [49 Cal.Rptr. 209], the court said at page 816: "The void sale or issuance of certain shares made in violation of the terms of the permit under which they were issued does not invalidate the sale of other shares of the same issue made in compliance with the requirements of the permit [citation], even when the shares issued in violation of the permit were issued as a part of the same transaction and represented by the same certificate as the shares sold in compliance with the permit [citation]."

A similar holding is found in *Kent* v. *Kent,* 6 Cal.App.2d 488, 492-493 [44 P.2d 445]: "The Corporate Securities Act as it existed at the time of the stock issue here involved provided that every security issued without a permit of the corporation commissioner authorizing the same should be void. We do not believe that this language can be construed to mean that the issue of a part of the shares of a corporation without a permit should render the entire stock issue void, . . . The section is clearly limited to the single effect of declaring void those shares not issued in accordance with the required permit." (See also *Austin* v. *Hallmark Oil Co.,* 21 Cal.2d 718, 727 [134 P.2d 777]; *Wortley* v. *Wood-Callahan Oil Co., Ltd.,* 17 Cal.2d 762, 767 [112 P.2d 226].)

In the instant case as of August 31, 1959, plaintiffs owned the entire ranch, subject to encumbrances and the claims of the nine California investors. Pursuant to resolution of the corporate board of directors at the August 31, 1959 organizational meeting held in Nevada, the Nevada corporation issued and delivered to plaintiffs in Nevada in November 1959, 900 shares of stock in consideration for the transfer by plaintiffs to the corpora-

tion of a 90 per cent interest in the ranch. No question has been raised as to noncompliance with Nevada law as to this transaction and we find no basis for holding that the stock issued and delivered to the plaintiffs in Nevada by the Nevada corporation was not valid under Nevada law. Even if Clejan intended to transfer a portion of the stock to the nine California investors, either as a gift or as consideration for their loans, and even if transfers to the nine investors would have been violative of the Corporate Securities Law, since the transfers were never consummated, the transactions with the nine investors had no effect on the validity of the stock.

 ██ (2) *The Stock Sold Defendant Was an Exempt Transaction.* Section 25152 of the Corporations Code[6] provided that ". . . the Corporate Securities Law does not apply to the sale of securities when (a) made by or on behalf of a vendor not the issuer or underwriter thereof who, being a bona fide owner of the securities, disposes of his own property for his own account, and (b) the sale is not made, directly or indirectly, for the benefit of the issuer or an underwriter of the security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provision of the Corporate Securities Law."

In support of his contention that the sales agreement made in California on December 23, 1960, was not exempted under section 25152, Corporations Code, defendant Reisman argues that the corporation was the *alter ego* of plaintiffs at the time the stock was issued, that an *alter ego* who issues to himself stock in a corporation solely owned and controlled by himself does not come within the exemptions of section 25152, Corporations Code (*Conrad* v. *Superior Court,* 209 Cal.App.2d 143 [25 Cal.Rptr. 670]); that plaintiffs were in effect the issuers and underwriters of the stock; that the issuance and subsequent sale of the stock by plaintiffs required a permit (*Maner* v. *Mydland,* 250 Cal.App.2d 526 [58 Cal.Rptr. 740]; Corp. Code, § 25500[7]; Corp. Code, § 25003; Corp. Code, § 26104[8]); and that the sale of the stock under the December 23, 1960, agreement was therefore illegal (*Pyle* v. *Shipman,* 251 Cal.App.2d 913, 916-917 [60 Cal.Rptr. 46]) and void (*Tevis* v. *Blanchard,* 122 Cal.App.2d 731, 738 [266 P.2d 85]; Corp. Code, § 26100).

Plaintiffs deny these contentions, arguing (1) that since the sale was made some 13 months after the stock had been issued and approximately 12 months after plaintiffs were ousted as officers and directors of the corporation and had become minority stockholders and defendants had become

---

[6]Repealed 1968 and now incorporated in Corporations Code section 25104, subdivision (a).

[7]Now Corporations Code section 25110.

[8]Now Corporations Code section 25540.

the majority stockholders, officers and directors of the corporation, it cannot be held to have been for the direct or indirect benefit of the issuer or underwriter; (2) that they sold by the December 23, 1960, agreement "personally owned" stock; and (3) that it was not a part of a scheme to evade the Corporate Securities Law. Plaintiffs further urge this court to disregard the *alter ego* theory because it was neither pleaded nor set forth as an issue in the pretrial order.

 If the facts of a case present an issue of illegality of a contract, it must be considered by the court, whether pleaded or not; the court may raise the issue on its own motion. (*Pyle* v. *Shipman, supra,* 251 Cal.App.2d 913, 917; *Tevis* v. *Blanchard, supra,* 122 Cal.App.2d 731, 733.) We therefore consider the contention that plaintiffs were the *alter ego* of the corporation and therefore do not qualify for exemption under section 25152 of the Corporations Code.

Reisman relies on *Conrad* v. *Superior Court, supra,* 209 Cal.App.2d 143. In *Conrad* a promoter was charged with several felony counts under the Corporate Securities Law, and sought a writ of prohibition to restrain the superior court from further proceedings. The evidence was summarized on page 148: "[T]he evidence creates a clear picture of a promoter of a speculative mining venture soliciting and obtaining money from four individuals upon representations and, in fact, an agreement, that they were to receive his personal shares in the corporation, represented to be then issued and in escrow, with a further agreement that the money thus obtained would be used for the benefit of the corporation; all of this done when, in fact, the corporate shares had not been issued and when the application before the California Corporation Commissioner for their issuance had been removed from the 'pending file' and was later abandoned." In denying the writ of prohibition, the court held that the facts presented were legally sufficient to hold the promoter for trial, that under the *alter ego* theory, it could be found that he was not only the corporation, but also both the issuer and underwriter of the shares.

Plaintiffs rely on *Associated Vendors, Inc.* v. *Oakland Meat Co.,* 210 Cal.App.2d 825, 837-838 [26 Cal.Rptr. 806]: " ' "Before a corporation's acts and obligations can be legally recognized as those of a particular person, and vice versa, it must be made to appear that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." ' " [Citations.]

"The gist of the cases which have considered the doctrine is that *both* of these requirements must be found to exist before the corporate existence will be disregarded; that such determination is primarily one for the trial court and is not a question of law; and that the conclusion of the trier of fact will not be disturbed if it be supported by substantial evidence. [Citations.] ■ It should also be noted that, while the doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished. Accordingly, bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity. [Citations.]" ■ Conditions under which a corporate entity may be disregarded vary according to the circumstances in each case. (*Automotriz etc. De California* v. *Resnick,* 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042].)

It appears that in the instant case the first requirement of the *alter ego* doctrine was present as of the date of issuance of the stock, namely, that there was such a unity of interest and ownership that the separate personalities of the corporation and the individual did not exist. We look to the second requirement, that if the acts are treated as those of the corporation alone, an inequitable result will follow. Although numerous factors have been held to be a sufficient basis for meeting this requirement (see *Associated Vendors, Inc.* v. *Oakland Meat Co., supra,* 210 Cal.App.2d 825, 838-840), the only one relevant under the facts of this case is inadequate capitalization. However, with respect to the cases that pertain to the effect of inadequate capitalization, we find a common factual situation, an attempt to escape liability by the incorporators or shareholders. The element of fraud is present. (See: *Minton* v. *Cavaney,* 56 Cal.2d 576, 579-580 [15 Cal.Rptr. 641, 364 P.2d 473]; *Automotriz etc. De California* v. *Resnick, supra,* 47 Cal.2d 792, 796-798; *Shea* v. *Leonis,* 14 Cal.2d 666 [96 P.2d 332]; *Carlesimo* v. *Schwebel,* 87 Cal.App.2d 482 [197 P.2d 167]; Ballantine, Corporations (rev. ed. 1946) § 129, pp. 302-303.)

Reisman has cited no authority, and we have found none, wherein the corporate entity has been disregarded under facts similar to the instant case where there was no allegation or evidence of fraud, or where, during a lapse of a considerable period of time, the incorporator is no longer the majority stockholder and is no longer a part of the management of the corporation. *Conrad* v. *Superior Court, supra,* 209 Cal.App.2d 143, relied on by Reisman is inapplicable under these circumstances.

■ We conclude that in the instant case there was substantial evidence to support the trial court's findings that due to the passage of time, the change in stock ownership, and the change in management, plaintiffs can-

not be deemed to be the *alter ego* of the corporation or the issuers or under-writers of the stock within the meaning of section 25152 of the Corporations Code as of the date of the sales agreement, December 23, 1960, approximately 13 months after the stock was issued and one year after defendants had become the majority stockholders and had taken over the management of the corporation; that as of December 23, 1960, the plaintiffs were the bona fide owners of 350 shares of stock; that they sold their own property for their own account; that the sale was not made directly or indirectly, for the benefit of the issuer or an underwriter of the security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provisions of the Corporate Securities Law. The trial court properly found that the December 23, 1960, agreement covered the sale of exempt securities, was not an illegal transaction, and that the parties were not *in pari delicto*.

In view of our conclusion we need not discuss plaintiffs' contention and the trial court's finding that defendant Reisman is estopped from denying the validity of the stock.

### *Exclusion of Evidence of Accord and Satisfaction*

Defendant contends that evidence was erroneously excluded which tended to show that a check in the sum of $8,125 and the signed agreement of February 1, 1963, were delivered to Albert H. Allen, plaintiffs' attorney, upon the following conditions: (1) that Clejan would obtain a grant deed to 10,121 acres of Gamble Ranch land from Benaron, or a contract from Benaron agreeing to convey such land to Clejan free and clear; (2) that Allen would hold the Reisman check and signed agreement until receipt of the above from Benaron and would then and only then deliver the check and signed agreement to Clejan; (3) that Clejan's receipt of the deed or contract to convey land from Benaron would discharge any further liability of Reisman to Clejan; and (4) that Allen also agreed the check and signed agreement would be returned to Reisman if Benaron did not deliver either a deed to the land or a contract to convey the land. Reisman contends that since these conditions were not satisfied, he was exonerated upon the theory of accord and satisfaction.

The evidence was offered for the sole purpose of showing that Reisman never completed the execution of the agreement by delivery. (Witkin, Cal. Evidence (2d ed. 1966) §§ 741-742.)

Without discussing the evidentiary ruling, we dispose of the point on other grounds. First, for an accord and satisfaction to be effected, there must be a bona fide dispute as to the amount due. (*Kelly* v. *David D. Bohannon Organization,* 119 Cal.App.2d 787, 795 [260 P.2d 646].)

Here there was none. ■ Second, the proffered evidence is in direct conflict with the agreed statement of facts as to the events and agreement of February 1, 1963. Defendant is bound by that statement and evidence contrary thereto is inadmissible.

### Attorneys' Fees

■ Plaintiffs' appeal presents only one issue, the contention that the award of $3,000 for attorneys' fees was inadequate and constituted an abuse of discretion. No evidence was received on the issue. Counsel for plaintiffs informed the court that 468 hours were spent by members of his office in preparation of the case for trial. In addition, two members of his firm were present in court during the eight days of trial. Counsel argues that based on a total of 500 hours, the award allows only $6 per hour.

*Berry* v. *Chaplin,* 74 Cal.App.2d 669, 679 [169 P.2d 442], summarizes the major factors to be considered in determining the reasonableness of attorneys' fees: "the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed."

■ Testimony or other direct evidence of the reasonable value of the services need not be introduced, the knowledge and experience of the trial judge being sufficient. (*Frank* v. *Frank,* 213 Cal.App.2d 135, 137 [28 Cal.Rptr. 687].)

■ Considering the various factors mentioned in *Berry, supra,* we hold that the award of $3,000 was wholly inadequate and an abuse of discretion, and that the case must be remanded for the purpose of redetermining the reasonable value of the services rendered.

■ The contracts provide for attorneys' fees to the successful litigant. This provision covers fees on appeal and may be determined by this court or the trial court when it determines costs. (Code Civ. Proc., § 1034; *Rabinowitch* v. *California Western Gas Co.,* 257 Cal.App.2d 150, 160 [65 Cal.Rptr. 1].) The latter procedure is preferred in this case.

The judgment is affirmed in all respects except as to the award of attorneys' fees; as to the latter, it is reversed and the matter is remanded to the trial court for the purpose of redetermining the reasonable value of the services rendered in the preparation and trial of the case, for the purpose

of fixing an award of attorneys' fees on appeal, and for the additional purpose of modifying the judgment accordingly. Plaintiffs are awarded their costs on appeal.

Cobey, Acting P. J., and Allport, J., concurred.

A petition for a rehearing was denied March 31, 1970, and the petition of defendant and appellant for a hearing by the Supreme Court was denied May 6, 1970. Mosk, J., was of the opinion that the petition should be granted.