**IPEC INC., an Illinois corporation, Plaintiff–Appellee,**

v.

**INTERNATIONAL LITHOGRAPHING CORP., a Pennsylvania corporation, Defendant–Appellant.**

**No. 88–1860.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1988.

Decided March 10, 1989.

Mitchell Bach, Fineman & Bach, Philadelphia, Pa., for defendant-appellant.

Bruce T. Logan, Ash Anos Freedman & Logan, Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, and POSNER, Circuit Judges, and GRANT, Senior District Judge.[*]

CUDAHY, Circuit Judge.

This case arose from a dispute over the sale of a printing press. The plaintiff, IPEC Incorporated ("IPEC"), prevailed in a bench trial before Judge Hart, who entered a $225,000 judgment in IPEC's favor. The defendant, International Lithographing Corporation ("International"), appeals. We affirm.

---

* The Honorable Robert A. Grant, Senior Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

## I.

### A.

In June of 1986, IPEC acquired a used four-unit Baker Perkins G–16 web printing press, along with two other presses, when it purchased the contents of the Western Lithograph plant in California. IPEC immediately began attempts to sell the press to International in conversations between IPEC's Chairman of the Board, Leonard Kosoglad, and International's President, Barry Green. At the same time a used printing press salesman, Rudy Otepka, was also attempting to sell Green a different Baker Perkins G–16 press, then located in Atlanta, Georgia. On June 12, IPEC sent International an information sheet describing the printing press and two other presses. On July 3, Green offered to buy the press for $1,300,000. IPEC did not accept Green's offer. On July 9, IPEC sent International a proposed sale agreement setting the price of the press at $1,525,000. This agreement was never executed.

IPEC then arranged to hold an auction of the Western Lithograph plant contents on July 17, 1986. Although IPEC originally entered a joint venture with the auctioneer, Melvin Peters (doing business as Continental Plants), it subsequently repurchased all of Continental Plants' interest in the Western Lithograph plant prior to the auction. On the morning of the auction, Kosoglad telephoned Green from Los Angeles to offer him the press at a price of $1,350,000. When Green agreed to this price, Peters concluded the sale with Green by phone. Although there was disputed evidence as to the discussion between Peters and Green, the district court further found that after the sale had been concluded, Green directed Peters to "place the press on the block at the auction." Appendix at A–10. Peters did so, but did not receive any bids higher than $1,350,000.

An exchange of facsimile transmissions followed the July 17 telephone conversation between Peters and Green. The first of these, from Green to Continental Plants, confirmed the oral agreement: "As per our agreement, we will purchase a G16 Baker Perkins web offset press with all attachments, located at Western Printing in Los Angeles. Total price—$1,350,000. It is understood that we own this press as of 9 a.m. California time." Appendix at B–25. Peters responded the same day with a letter accepting Green's offer subject to several terms and conditions, including the provision that "[t]he press is sold 'as is, where is' ". Id. at B–26. After this exchange, the auction proceeded. On the following day, July 18, another exchange between Peters and Green spelled out additional conditions. Specifically, Green asked that International be given until August 17, 1986, to remove the press without penalties; that International be given certain spare parts, rollers and equipment; that International be relieved of any taxes accompanying the sale; and that Peters warrant that the combination folder on the press had double parallel cylinders so that International could make double parallel folds. Id. at B–27—B–30. Peters accepted all of Green's terms, and International sent a check by Federal Express in the amount of $50,000 as a deposit.

By the time the deposit check arrived on July 22, 1986, Green had already stopped payment on it. In a telephone conversation with Kosoglad, Green explained that he had taken that action upon hearing that, contrary to the seller's representations, the press was not new in 1982, that it was not in the beautiful condition promised, that two of the four printing units of the press were experimental or prototype and that the folder was an experimental or prototype unit made in 1979. According to Green, this information came from Otepka. Kosoglad denied these allegations. Green then arranged to go out to California to look at the press in person. Kosoglad had repeatedly invited Green to do this before the sale, and the auction brochure sent to Green clearly stated that the Baker press was open for inspection on July 15 and 16. After the auction was concluded, the electrical hookups for the presses at the plant had been disconnected. IPEC was obligated to pay the owner of the plant $1,850 a month rental for the use of the plant. Green and his plant manager, Clayton

Meadows, arrived to inspect the plant on July 25, 1986.

After Green and Meadows inspected the press, they met with Kosoglad and his son Jerome Kosoglad, the President of IPEC. During the course of the meeting a new bill of sale was drawn up in the amount of $1,125,000. The new agreement also provided that IPEC would hold International harmless against the original purchase agreement. On July 28, International wire-transferred the purchase price to IPEC.

## B.

In August of 1986, IPEC brought this diversity action against International for breach of the first contract, asking for the balance due on the original purchase price ($225,000) plus interest and court costs. International filed a counterclaim and a third-party complaint, but subsequently withdrew them both voluntarily. In response to IPEC's attempt to enforce the first contract, International argued that the second contract modified or superseded the first one and that International had been released from the earlier contract. Alternatively, International asserted that the second contract was an accord and satisfaction of a bona fide dispute that arose between the parties. The parties stipulated at the opening of the trial that the Uniform Commercial Code governed this case, and that applicable precedent from Illinois, California or Pennsylvania could be used because the law of the three states as to the Code sections in question was essentially the same.

Following a bench trial, Judge Hart ruled for the plaintiff. He first concluded that the exchange of facsimile transmissions on July 17 and 18 constituted an integrated agreement setting out the express warranties that the parties intended to make. Because it was clear that Green had not at that point inspected the press, although he

had had opportunities to do so, and that he had purchased the press "as is, where is," the initial agreement excluded implied warranties of any kind under the Uniform Commercial Code. U.C.C. § 2–316(3)(a). After a thorough consideration of the evidence, Judge Hart rejected the defendant's contention that the press was not as originally warranted, finding that "there is no indication ... that this press was anything other than what it purported to be, a unit of operation described in both the auction material beforehand and in the one copy of the sales document." Appendix at A–15. The court ruled that it could not conclude that the press was in any way experimental, nor that there was any misrepresentation as to the age of the press, and additionally noted that even if portions of the press were new or prototypes, there was no evidence that that would materially affect the value of the press.

As to the second contract, Judge Hart concluded that economic duress had been imposed on the plaintiff in negotiating the new purchase price, given the difficulty in finding buyers for the press once the auction was over and the press disconnected. The court also considered, in reaching its finding that "by virtue of fact and circumstance" the second contract was obtained under duress, the expense of shipping and storing the press if it had to be moved from the premises IPEC was then leasing. *Id.* at A–19. Because the second contract was not negotiated in good faith, as defined by the Uniform Commercial Code,[1] it could not operate as a modification or waiver of the first contract.[2] Judge Hart entered judgment for IPEC in the amount of $225,000, with interest and costs.

International raises two issues on appeal: (1) Did the district court err in its determination that IPEC signed the second contract under economic duress? and (2) Did the district court err in failing to find that

---

1. The Uniform Commercial Code defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." § 2–103(1)(b).

2. The court cited the California Code Comment, which specifically states that "section 2209 does

not free one to extort additional consideration by refusing in bad faith to carry out his original commitment. Section 1203 imposes a duty of good faith in all transactions." Cal.Com.Code, § 2209, comment.

the second contract constituted an accord and satisfaction?

## II.

International bears a heavy burden in disputing the district court's ruling. The findings of fact upon which the district court's decision was based may be rejected only if they are "clearly erroneous," Fed.R. Civ.P. 52(a), and "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Because International challenges a verdict in IPEC's favor, we take all evidence and inferences in the light most favorable to IPEC. *United States v. Goudy*, 792 F.2d 664, 674 (7th Cir.1986); *see also United States v. William Thomas*, 864 F.2d 188 (D.C.Cir.1988) (standard of review in challenges to verdict in bench trial same as that in jury trial).

█ We consider first whether the district court erred in ruling that IPEC signed the second contract under duress. Judge Hart's decision as to duress rested on his findings that

the failure to sell that press on July 17 would materially affect its value, that the press was located on premises which were not then and there owned by the owners of the equipment, that it would have been necessary to freight this press and put it in a warehouse, and that such an expense could reasonably be very substantial based upon the moving cost as disclosed by the evidence in this case....

Further, the evidence reasonably and credibly shows that to have failed to obtain $1,125,000 for this press, or $1,350,000, which is the original purchase price, would have resulted in a very substantial loss on this transaction to the plaintiff company and to the IPEC interest by virtue of the fact that a bank loan

had been obtained to support the transaction.

Appendix at A–18. In light of these circumstances and "the time-frame that is imposed by the sale of goods of this kind," the district court concluded that IPEC had been under duress and that International had not exercised good faith in negotiating the second contract. The court also noted that the negotiated reduction in selling price in the second contract was not tied to any stated or admitted defect, and this bolstered its conclusion that International did not have a good faith dispute with IPEC at the time of the second contract. The court's conclusions were carefully considered and well-grounded in the evidence presented at trial. We cannot conclude that they were clearly erroneous.

International tells a different story than did the district court. In its brief it stresses that IPEC made a profit on the purchase and subsequent sale of the contents of the Western Lithograph plant, that International came to California "in good faith" to renegotiate the contract, that the subsequent drop in price in the second contract was the result of "hard bargaining" rather than duress and that IPEC had "other alternatives" than to accept the lowered price. Essentially, International urges us to accept its version of the facts. However, it is not open to us to reweigh alternative interpretations of the facts on appeal. Unless Judge Hart's findings are clearly erroneous, we must accept his view of the facts. We cannot say that his conclusions were clearly erroneous. It was quite reasonable to conclude from the evidence presented at the trial that International did not negotiate in good faith, given that it had already attempted to resell the press (and failed) before repudiating the original contract. Judge Hart gave careful consideration to International's claims about defects in the press and concluded, again based on a reasonable interpretation of the evidence, that the press was not

defective or in worse condition than had been warranted. Thus International cannot rely on the claimed defects as a reason for repudiating the first contract. Without that excuse, it has no good faith reason for its actions in the dispute that ensued.

■ This absence of good faith is fatal to either of the defenses International raised. Any modification or waiver as to the first contract, though it did not necessarily need to be supported by consideration, had to "meet the test of good faith" imposed by the Uniform Commercial Code. U.C.C. § 1–107, comment; U.C.C. § 2–209, comment 2. On the other hand, for the second contract to constitute an "accord and satisfaction," as International concedes, there has to have been a "bona fide dispute." [3] Judge Hart clearly indicated that the dispute in this case was not bona fide, based on evidence regarding International's exercise of its ownership prerogatives the day of the auction, its failure to resell the press that day, the condition of the press and the situation surrounding the renegotiation of the second contract.

### III.

Judge Hart's finding, that International did not act in good faith in repudiating its first contract with IPEC and in renegotiating a second contract, is not clearly erroneous, but is rather well-grounded in the evidence presented at trial. Because the second contract was not negotiated in good faith, it was neither a valid modification nor waiver of the first contract—nor could it meet the standard required of an "accord and satisfaction." The judgment of the district court is

AFFIRMED.

---

3. This is true both in California, *Potter v. Pacific Coast Lumber Co. of California,* 37 Cal.2d 592, 234 P.2d 16 (1951); *Connecticut Printers, Inc. v. Gus Kroesen, Inc.,* 134 Cal.App.3d 54, 184 Cal. Rptr. 436 (1st Dist.1982); *Western Concrete Structures Co. v. James I. Barnes Constr. Co.,* 206 Cal.App.2d 1, 23 Cal.Rptr. 506 (1st Dist.1962); *MacIsaac & Menke Co. v. Cardox Corp.,* 193 Cal.App.2d 661, 14 Cal.Rptr. 523 (2d Dist.1961);

*Kelly v. David D. Bohannon Org.,* 119 Cal.App.2d 787, 260 P.2d 646 (1st Dist.1953), and in Illinois. *W.E. Erickson Constr., Inc. v. Congress–Kenilworth Corp.,* 132 Ill.App.3d 260, 87 Ill.Dec. 536, 477 N.E.2d 513 (1st Dist.1985); *Kreutz v. Jacobs,* 39 Ill.App.3d 515, 349 N.E.2d 93 (3d Dist.1976); *see also Lowrance v. Hacker,* 866 F.2d 950 (7th Cir.1989).