[S.F. No. 24107. Sept. 4, 1980.]

THEO L. FOX, Plaintiff, Cross-defendant and Respondent, v.
HARRY C. EHRMANTRAUT, Defendant, Cross-complainant and
Appellant.

COUNSEL

Henrikson & Gee, Eric L. Henrikson and Brennan J. Newsom for Defendant, Cross-complainant and Appellant.

Hession, Creedon, Hamlin, Kelly, Hanson & Williams, Laurence P. Wilson and Richard G. Logan for Plaintiff, Cross-defendant and Respondent.

Robert E. La Noue, Robert M. Arhelger, Larry W. Kreig and C. J. San Felipe as Amici Curiae.

OPINION

CLARK, J.—Defendant and cross-complainant, Dr. Harry C. Ehrmantraut, appeals from judgment for plaintiff and cross-defendant, Theo L. Fox, in this action to recover on a promissory note and a cross-action for misrepresentation, fraud, breach of contract, and rescission. We affirm.

In July 1974, Fox, a businessman and investor, agreed to purchase M. A. Baker and Associates, a company engaged in the search for and placement of business executives in the San Jose area. M. A. Baker and

Associates was licensed under agreement with Executive Search Associates, Inc., to use certain techniques in bringing employers and qualified prospective employees together.[1]

Fox formed Execudex San Jose, Inc. and transferred to it the assets of M. A. Baker and Associates in exchange for all stock issued by Execudex San Jose. Fox also purchased from Executive Search Associates licenses for San Francisco, Oakland, San Diego, Phoenix and Dallas. He personally managed a licensee business in San Francisco, while other persons managed licensee operations in San Jose.

In December 1974, Executive Search Associates, Inc., the licensor company, experienced financial difficulties and Fox formed a new corporation, Execudex, Inc., to acquire the licensor's assets and to assume selected liabilities.

Execudex, Inc. placed advertisements in the Wall Street Journal offering to license other areas of operations. In December 1974 Fox placed an advertisement in that paper, stating: "Investment Opportunity. Unique investment opportunity in the human resources industry. Established company licensed by national concern with new and exciting concepts. Experienced management in place, Santa Clara County, California location. Conflict of interest forces sale by absentee owner. Responsible investor could expect return of mid-five figure investment plus during 1975. For details phone Mr. Butler."

Ehrmantraut read the advertisement and in late December 1974 called Butler. Ehrmantraut has a doctorate in biophysics and, beginning in 1954, had created several small companies. As chief executive he had directed marketing, engineering and manufacturing activities and had ultimately sold the companies for substantial profits. He also worked as a business consultant primarily for new business ventures in which he was personally involved.

On 12 February 1975, after a number of meetings with Fox and employees of Execudex San Jose, attendance at a seminar conducted by Execudex, Inc. and visits to two licensees in Southern California, Ehrmantraut entered an agreement with Fox to purchase all outstanding

[1]The firms used videotape recordings to match employee candidates with prospective employers. The parent company provided a manual and training seminars and contemplated a nationwide system of sharing information.

shares of Execudex San Jose for $25,000 cash and a promissory note for $60,000 payable in eight monthly installments. The original proposal by Fox had been for sale of the assets and assumption of liabilities of the business rather than sale of shares. The record does not disclose who requested the transaction be restructured.

Before executing the agreement Ehrmantraut was advised that, while earlier projections had indicated Execudex San Jose would realize profit in 1974, the projections were inaccurate and the corporation had continually lost money.

A consent to transfer shares of Execudex San Jose was obtained from the Corporations Commissioner. Ehrmantraut paid the $25,000, executed the note, received the stock certificate, and took control of Execudex San Jose. The stock was never qualified for public sale.

On 7 May 1975, the Commissioner of Corporations issued a cease and desist order against Execudex, Inc. on the ground that it was selling franchises in violation of the California Franchise Investment Law. Before the time for any administrative hearing, Execudex, Inc. entered voluntary bankruptcy. Ehrmantraut continued to operate Execudex San Jose until September 1975 when it petitioned for voluntary bankruptcy.[2]

Fox commenced this action to recover $60,000 owing him personally on the note. Ehrmantraut answered and cross-complained claiming misrepresentation, fraud, and failure of consideration, seeking damages and rescission. It is not alleged that Fox sold unqualified securities in violation of the Corporations Code, that Fox was the alter ego of Execudex, Inc., or that the contract of sale is void for any illegality. After trial without a jury, the court concluded Fox had not made false representations of nor had concealed any material fact. Judgment was entered for Fox on both the complaint and cross-complaint.

After taking the instant appeal, Ehrmantraut filed a petition in voluntary bankruptcy. Fox filed in that proceeding proof of claims asserted in these proceedings including a copy of the judgment. While Ehrmantraut has been discharged in bankruptcy, the trustee in bankruptcy has abandoned the right of appeal in the instant case to Ehrmantraut.

---

[2]Other licensees have continued in business, including Execudex of San Francisco, Inc.

Both Fox and Ehrmantraut suffered substantial losses in the executive placement business.

## I. MISREPRESENTATION AND FRAUD

### A. *Statements of Financial Status of Execudex, Inc. (The Parent Corporation)*

■ Ehrmantraut does not claim misrepresentation as to the firm he purchased but rather that material misrepresentations of fact were made as to accounts receivable and the capital account of Execudex, Inc., the licensor. He notes a financial statement dated 31 December 1974 showed $52,000 in accounts receivable without mentioning they were of doubtful collectability, and $58,000 of "stockholder's investments" without mentioning the amount was in fact a loan from Fox to Execudex, Inc.

Admittedly, Ehrmantraut did not see the 31 December 1974 financial statement until after purchasing the stock of Execudex San Jose. However, he claims the Execudex, Inc. controller had shown him a handwritten draft of the document prior to the purchase. The controller testified that he had *no* recollection of ever showing or discussing the statement with Ehrmantraut, but that he discussed a financial projection indicating Execudex, Inc. would be successful if two licenses could be sold a month,[3] that in response to a question by Ehrmantraut he advised Fox was providing financial backup during the "start up" period, and that the statements he discussed with Ehrmantraut were the financial projection for Execudex, Inc. and a "rough" financial statement for Execudex San Jose. The controller, who was a certified public accountant, also testified that when a sole shareholder advances money to a corporation he will often treat the advance as a loan for tax purposes and that characterization of the money as capital was not improper because Fox as a practical matter could not remove the money.

The trial court could properly determine that the alleged misrepresentations as to the financial affairs of Execudex, Inc. were not made until after the purchase of Execudex San Jose was completed.

---

[3]After Execudex, Inc. was formed, it succeeded in selling only one license.

B. *Statements of Compliance with Franchise
Investment Law (Corp. Code, § 31000 et seq.)*[4]

Ehrmantraut testified that at their second meeting Fox stated that papers were being prepared to register licensing transactions under the Franchise Investment Law. Ehrmantraut said he was familiar with the law and believed compliance was required.

Ehrmantraut also testified that at a training session in January 1975 he received a pamphlet from the vice president of Execudex, Inc., which stated: "I will be glad to review with you on an individual basis the financial statements of Execudex Incorporated. We will shortly be making the uniform franchise disclosure statement in the various States. This disclosure requires the inclusion of certain financial information."

Fox denied that he advised documents were being prepared to register under the Franchise Investment Law. He testified that in September 1974 in response to his question, M. A. Baker, president of the then licensor company advised him that the company had reviewed the matter with officials of the Corporations Commissioner's office in February, presenting copies of contracts used in licensing agreements. It was concluded the company was not a franchisor but a licensor and not required to register. Fox was sent a copy of counsel's letter of confirmation. In support of his denial of the statement claimed by Ehrmantraut, Fox argues that, having been advised by counsel and the office of the Corporations Commissioner that registration under the Franchise Investment Law was not required, there was no reason to represent that there would be a registration.

Fox also testified that he had sent for and obtained information from the National Association of Franchisers regarding state laws relating to franchises.

The trial court could properly find that Fox, having received confirmation that registration was not required in California, did not state that papers were being prepared to register in this state. Accepting the conflicting Fox testimony, the trial court could also reject Ehrmantraut's testimony that he had been interested in or had inquired into

---

[4]Unless otherwise indicated all statutory references are to the Corporations Code.

preparation of the franchise disclosure statement, and the court could determine that the statement in the pamphlet was not material to the purchase.

■ Ehrmantraut next contends that Fox had a duty to disclose the Corporations Commissioner was engaged in an "investigation" of Execudex, Inc., and that failure to disclose constituted fraud. On 28 October 1974—after the letter stating that Execudex, Inc.'s predecessor was not a franchisor—the Corporations Commissioner requested information by a letter addressed to the attorney who had represented the predecessor company. Fox learned of the letter but did not respond, and the commissioner did nothing further until after the sale to Ehrmantraut when he sent a follow-up letter. The 28 October letter was the only information Fox had of the asserted "investigation" at the time of sale. The trial court could properly determine that the letter did not reflect an investigation and that Fox was not under a duty to disclose.

Record evidence warrants a determination that Fox and Ehrmantraut were knowledgeable investors with extensive business experience and expertise, that Ehrmantraut engaged in an extensive investigation into activities of Execudex San Jose before agreeing to purchase shares of stock from Fox, and that there were no material misrepresentations or concealment as to that company or Execudex, Inc. So far as appears, the failures of the executive placement service ventures were due not to any misrepresentation by Fox but to difficulties inherent in the executive placement business during the 1974-1975 recession.

## II.  FAILURE OF CONSIDERATION

■ Ehrmantraut contends he is entitled to rescission because he did not receive the services contemplated from Execudex, Inc. First, he urges there was a failure of consideration because Execudex, Inc. was insolvent at the time the sale of Execudex San Jose was consummated. However, the record does not establish the claimed insolvency.

Second, it is urged that, because Execudex, Inc. filed bankruptcy about three months after the sale, Ehrmantraut did not receive the benefit of the license agreement and that the bankruptcy caused a failure of consideration.

Civil Code section 1689, subdivision (b), provides: "A party to a contract may rescind the contract in the following cases:... [¶] (2) If the

consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds. [¶] (3) If the consideration for the obligation of the rescinding party becomes entirely void from any cause. [¶] (4) If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause...."

Fox fully performed his obligations under the agreement transferring all stock of Execudex San Jose, Inc. to Ehrmantraut. Fox did not warrant that Execudex, Inc. would continue to furnish services for more than three months or any period, and in the absence of misrepresentation it must be concluded that Ehrmantraut received the consideration bargained for and that the subsequent failure of Execudex, Inc. did not cause a failure of consideration. (See, e.g., *Lavely* v. *Nonemaker* (1931) 212 Cal. 380, 383 [298 P. 976]; *Schiffman* v. *Atlas Mill Supply, Inc.* (1961) 193 Cal.App.2d 847, 851-853 [14 Cal.Rptr. 708]; *Norby* v. *Pister* (1952) 114 Cal.App.2d 510, 511-512 [250 P.2d 633].) The license with Execudex, Inc. was only one of the assets of Execudex San Jose, Inc., and because Execudex, Inc. and Fox were independent entities, its failure cannot be attributed to Fox.

III. ILLEGALITY

A. *Corporate Securities Law*

Section 25130 provides: "It is unlawful for any person to offer or sell any security in this state in any non-issuer transaction unless it is qualified for such sale...or unless such security or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part."

Security is broadly defined by the act. Included in the lengthy enumeration of instruments constituting a security under section 25019 are, in addition to stock, any notes, evidence of indebtedness, or participation in any profit sharing agreement.

Section 25104 provides: "The following transactions are exempt from the provisions of Section 25130: [¶] (a) Any offer or sale of a security by the bona fide owner thereof for his own account if the sale (1) is not accompanied by the publication of any advertisement and (2) is not effected by or through a broker-dealer in a public offering."

It is undisputed that Fox was the bona fide owner of the stock selling for his own account and that the sale was not effected by or through a broker-dealer. The question presented is whether the sale was a sale of securities accompanied by an advertisement within the meaning of section 25104.

We are satisfied that the sale of an ongoing business by an owner advertising sale of the business is exempt from qualification requirement when transfer of the securities is merely incidental to the sale of the business.

Prior to 1969, it was well settled that the Corporate Securities Act did not apply to sale of securities by a vendor not an issuer unless the sale was made for benefit of an issuer or underwriter or made with intent to violate the securities law. (Former § 25104; *Clejan v. Reisman* (1970) 5 Cal.App.3d 224, 237 [84 Cal.Rptr. 897].) Under the prior statute, it is clear that the instant sale of stock would not have violated the statute.

The 1968 amendment to section 25104 recast the statute to its present form. The purpose of that section's exemption "is to eliminate any qualification requirement with respect to what are essentially private transactions by a person in his own property and to require such qualification only where a public market is created in outstanding securities." (1 Marsh & Volk, Practice Under the Cal. Securities Laws (rev. ed. 1979) p. 10-18.7.)

In determining the applicability of the act, California courts have traditionally looked through form to substance to further the purposes of the act. (*People v. Syde* (1951) 37 Cal.2d 765, 768-769 [235 P.2d 601]; *People v. Rankin* (1958) 160 Cal.App.2d 93, 97 [325 P.2d 10]; *Moore v. Stella* (1942) 52 Cal.App.2d 766, 772 [127 P.2d 300].) "'[A]s a general rule the sale of "securities" that is condemned by the courts involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money.'" (*Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 814-815 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135].)

Bona fide agreements for the sale of services providing for profit sharing have been held not to come within the act, although profit sharing agreements, like stock, are included in the broad definition of security in section 25019.

"It is settled that the Corporate Securities Law was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture. Such contracts are clearly distinguished from instruments issued to persons who, for a consideration paid, stipulate for a right to share in the profits or proceeds of a business enterprise to be conducted by others; and the court will look through form to substance to discover whether in fact the transaction contemplates the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers are to share. (*Domestic & Foreign Pet. Co., Ltd.* v. *Long*, 4 Cal.2d 547, 555 [51 P.2d 73]; *People* v. *Davenport*, 13 Cal.2d 681 [91 P.2d 892]; *Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718, 727 [134 P.2d 777]; *People* v. *Steele*, 2 Cal.App.2d 370, 374-375 [36 P.2d 40]; *Hollywood State Bk.* v. *Wilde*, 70 Cal.App.2d 103, 107 [160 P.2d 846]; *People* v. *Hoshor*, 92 Cal.App.2d 250, 253 [206 P.2d 882].)" (*People* v. *Syde, supra*, 37 Cal.2d 765, 768-769.)

Other cases have held the broker-dealer provisions of the Corporate Securities Law inapplicable to licensed real estate or business brokers when the real estate or business sale was effected by transfer of the corporate owner's total stock. (*Lyons* v. *Stevenson* (1977) 65 Cal.App.3d 595, 600-604 [135 Cal.Rptr. 457]; *Weber* v. *Jorgensen* (1971) 16 Cal. App.3d 74, 82 et seq. [93 Cal.Rptr. 668]; *Stoll* v. *Mallory* (1959) 173 Cal.App.2d 694, 698 et seq. [343 P.2d 970]; see *McKenna* v. *Edwards* (1937) 19 Cal.App.2d 327, 330 [65 P.2d 810].)[5]

Many small business and professional offices are incorporated for tax and other purposes in which investment and management are not separated but come from the same source. Advertisements for sale of businesses and for association with professional corporations are common in our newspapers. These advertisements—frequently contemplat-

---

[5]*Owen* v. *Off* (1951) 36 Cal.2d 751 [227 P.2d 457], held that a single transfer of shares was sufficient to invoke the Corporate Securities Law. The court did not consider whether the transfer of shares was merely incident to a sale of real property—only a portion of owner corporation's shares being sold.

ing present or future transfer of shares—were not intended to trigger a requirement of qualification with its extensive registration demands. Otherwise small businessmen seeking to sell and professional firms seeking employees would be gravely hampered without substantial furtherance of the purposes of the Corporate Securities Law. For example, incorporated law firms seeking to employ attorneys with a view to profit sharing or to future firm membership would be required to qualify if they advertised.

As we have seen, the purpose of the 1968 amendment to section 25104 was to eliminate the burdens of qualification in private transactions, requiring qualification only in public market securities. Sales of businesses and employment of professionals are essentially private transactions. Purchasers of businesses and professionals seeking employment are more than mere passive investors who do not personally investigate the opportunity. Advertisements for such sales or employment were not intended to result in deprivation of the nonissuer exemption.

▮ The advertisement in the instant case was for sale of a business. It mentioned neither securities nor corporation. At one time the parties considered consummating the sale by a sale of assets, and it is undisputed that had the parties proceeded in this manner, the Corporate Securities Law would not be applicable. The parties at all times contemplated that Ehrmantraut was not a mere passive investor but would undertake full control of the business. We conclude the nonissuer exemption is applicable and there was no violation of the Corporate Securities Law.[6]

### B. *Franchise Investment Law*

Section 31110 provides: "On and after April 15, 1971, it shall be unlawful for any person to offer or sell any franchise in this state unless

---

[6]Although the Commissioner of Corporations granted consent to transfer the shares to Ehrmantraut, the commissioner has filed an amicus brief claiming the sale was unlawful. The commissioner makes no claim that the consent was secured by fraud or misrepresentation.

The commissioner's consent will ordinarily be understood as meaning there is no violation of qualification requirements whether due to compliance or exemption. The commissioner should not consent to unlawful transactions because her consent provides a trap for unwary counsel who often could properly qualify the shares for sale if advised that qualification is required.

the offer of the franchise has been registered under this part or exempted under Chapter 1 (commencing with Section 31100) of this part." Section 31111 sets forth in extensive detail the numerous matters that must be included in an application for registration. The information required focuses on the history, financial status, and activities of franchisors and subfranchisors. Section 31112 requires that the application be verified by franchisors or subfranchisors. There is no provision for application by franchisees and subfranchisees.

Section 31113 provides that the commissioner may require escrow or impound of franchise fees where the franchisor fails to show adequate financial arrangements to carry out its obligations, and section 31114 requires the registration application be accompanied by a prospectus. Under section 31120, a registration is effective for one year unless the commissioner specifies otherwise.

Section 31102 provides: "The offer or sale of a franchise by a franchisee for his own account or the offer or sale of the entire area franchise owned by a subfranchisor for his own account, is exempted from the provisions of section 31110 if the sale is not effected *by or through* a franchisor. A sale is not effected by or through a franchisor merely because a franchisor has a right to approve or disapprove a different franchisee." (Italics added.)

█ Even assuming the sale of all the stock of a franchisee might be viewed as a sale of the franchise within section 31110, the instant transaction would be exempt under the provisions of section 31102. That section exempts sales by franchisees. The provision in the section excluding from the exemption sales effected "by or through a franchisor" excludes only those sales where the franchisor obtains all or a substantial part of the purchase price.

Mere franchisor participation in the sale by furnishing information, referring prospective purchasers of the franchise, or approving purchasers does not deprive a franchisee of his exemption. It is apparent from sections 31110-31114 and 31120 that registration is demanded of franchisors not franchisees. Franchisees are not permitted to register (§ 31112), and so far as appears none of the sections are intended to impose burdens upon franchisees. Any potential franchisee may be expected to seek information of the franchisor, and most may be expected to inquire of him as to the availability of franchises. The exemption for

sales by franchisee in section 31102 would be meaningless if franchisor responses to such inquiries served to deprive franchisees of the exemption.

In the present case, the stock of the franchisee was sold to Ehrmantraut by Fox, the owner of the stock. Although the franchisor, Execudex, Inc., furnished information and helped in facilitating the sale, it did not receive any of the purchase price.[7] Accordingly, the exemption provided by section 31102 for sales by a franchisee for his own account is applicable, and the sale did not violate the Franchise Investment Law.[8]

The judgment is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., Manuel, J., and Newman, J., concurred.

Appellant's petition for a rehearing was denied October 22, 1980.

---

[7]Because Fox had previously purchased the franchise in a bona fide sale, we are not confronted with a case where a franchisor has established a franchise with intent to use the section 31102 exemption to avoid the registration requirement.

[8]This conclusion makes it unnecessary to reach the questions whether the evidence establishes a franchise rather than a license arrangement and whether the section 31110 prohibition of sales of franchises without registration is violated when there is no transfer of the franchise but a sale of the stock of the franchisee.