[No. AO20015. First Dist., Div. One. Feb. 24, 1984.]

THE PEOPLE, Plaintiff and Appellant, v.
DARRELL M. SCHOCK et al., Defendants and Respondents.

## COUNSEL

John J. Meehan, District Attorney, and Greg R. Gibeson, Deputy District Attorney, for Plaintiff and Appellant.

John R. McCardle, Samuel Lawson, Jarvis & McCardle, Arthur L. Pretzer, Simonian & Pretzer, Jules F. Bonjour, Jr., and Bonjour, Gough, Stone & Remer for Defendants and Respondents.

## OPINION

**RACANELLI, P. J.**—In this appeal we consider the novel issue whether a fractional interest in a promissory note and related deed of trust constitutes a nonexempt "security" within the meaning of the Corporate Securities Law of 1968, as amended. (Corp. Code, § 25000 et seq.)[1]

### STATEMENT OF THE CASE

Defendants were charged with a number of violations of section 25110 (unlawful sale of unqualified security) and section 25401 (false statement in a security transaction) of the Corporate Securities Law arising out of their operation of a mortgage loan brokerage company. Following a preliminary hearing submitted on the basis of stipulated facts and documentary exhibits, the magistrate dismissed all but seven of the forty-nine counts of the felony complaint on the grounds that defendants' activities did not involve securi-

---

[1]Unless otherwise indicated, all statutory references pertain to the Corporations Code.

ties within the meaning of the Corporate Securities Law. The People now appeal the denial of their motion to compel reinstatement of the complaint. (Pen. Code, § 871.5.)

## FACTS

The facts as stipulated on appeal reflect the following:

Golden State Home Loans (hereafter GSHL), a California corporation, is a mortgage brokerage company partly owned by defendant Schock, its president, and employing codefendants Webster Van Blaricom and Robert Malone. GSHL's principal revenue was derived from brokerage fees and commissions charged to borrowers on loan transactions involving numerous lenders solicited generally through newspaper advertisements. Upon approval of loan applications, GSHL would offer the solicited lender a fixed rate of return until the loan repayment was due, secured by a deed of trust on the borrower's real property.

The transactions underlying the criminal charges involved loans to borrowers funded by many different lenders. Each lender who invested funds was given a "trust deed deposit" receipt reflecting the amount of money deposited with GSHL and the proportion of the total loan. When sufficient money was accumulated by GSHL to fund an approved loan, the funds were disbursed to the borrower in one of two ways: (1) the borrower would execute a promissory note and deed of trust in favor of the various lenders reflecting their proportionate undivided interests; or (2) the borrower would execute a promissory note in favor of Guarantee Equity Financial (hereafter GEF)—a separate corporation also partly owned by defendant Schock—naming GEF as beneficiary of the deed of trust; GEF would then endorse the note and assign the deed of trust to the various lenders in a manner reflecting their proportionate undivided interests.[2] Guaranteed Equities, Inc. (hereafter GEI)—another corporation owned by defendant Schock—was named as trustee in all the deeds of trust.

Simultaneously, each lender entered into a loan servicing agreement with GSHL appointing Security National Bank to collect loan payments for dis-

---

[2]The Marinas International and GSHL-Almar loans reflected in the limited record before us are both illustrative and revealing: Each short-term loan was in the face value of $600,000 with monthly interest only payable until maturity at which time the full amount of principal was due as a "balloon payment." The Marinas loan was funded by 42 investors (chiefly married partners, widows and trusts) possessing undivided fractional interests ranging from 1.75/600 to 95/600. The GSHL-Almar loan, the first phase of a $2.8 million joint venture construction loan (in which defendant Schock and his wife are reflected as having a 50 percent interest) was principally funded by 61 similarly representative investors possessing undivided fractional interests ranging from 1/600 to 25/600.

tribution to the lenders, authorizing GEI to advance payments—subject to reimbursement—to lenders on delinquent loan installments and to bid the unpaid loan balance at any foreclosure sale in the event of default.

The question on appeal is whether the instruments used in the GSHL loan transactions constitute securities. We will conclude for the reasons we explain that the instruments used fall within the statutory definition of securities and are not exempt from regulation.

I

*Security Transaction*

Under the pertinent provisions of the Corporate Securities Law, a "security" is defined to include: "any note; . . . evidence of indebtedness; . . . investment contract; . . . certificate of deposit for a security; . . . or, in general, any interest or instrument commonly known as a 'security'; . . ." (§ 25019.)[3]

The parties offer diametrically opposing interpretations of the statutory language, neither of which is found determinative. On the one hand, defendants focus on the absence of any express reference in the statute to either a *promissory* note or *deed of trust*. On the other hand, the People argue that the instruments involved fall squarely within the conventional classifications of notes, evidence of indebtedness, investment contracts, or certificates of deposit for a security.

While the courts have viewed the statutory enumeration as merely illustrative (see *Berman* v. *Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1005 [119 Cal.Rptr. 130] [futures contract in foreign currency as security]; *Clejan* v. *Reisman* (1970) 5 Cal.App.3d 224, 233-235 [84 Cal.Rptr. 897] [ownership interest in ranch a security]), a literal interpretation has been uniformly eschewed when to do so would appear to exceed any legitimate

---

[3]The section reads as follows: " 'Security' means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document."

legislative purpose. (See *People* v. *Davenport* (1939) 13 Cal.2d 681, 685-686 [91 P.2d 892]; *Hamilton Jewelers* v. *Department of Corporations* (1974) 37 Cal.App.3d 330, 334-335 [112 Cal.Rptr. 387]; *Nicholl* v. *Ipsen* (1955) 130 Cal.App.2d 452, 457-460 [278 P.2d 927].) ■ "[I]t plainly was not the legislative intent that '*every*' note or evidence of indebtedness, regardless of its nature and of the circumstances surrounding its execution, should be considered as included within the meaning and purpose of the act." (*People* v. *Davenport, supra,* 13 Cal.2d at p. 686.)

■ Thus, the determination of whether a particular instrument constitutes a security must be made on an ad hoc basis upon a review of the surrounding facts and circumstances and in light of the regulatory purposes to be served under the Corporate Securities Law. (*People* v. *Syde* (1951) 37 Cal.2d 765, 768 [235 P.2d 601]; *Sarmento* v. *Arbax Packing Co.* (1964) 231 Cal.App.2d 421, 424 [41 Cal.Rptr. 869]; *Oil Lease Service, Inc.* v. *Stephenson* (1958) 162 Cal.App.2d 100, 107-108 [327 P.2d 628].) Ultimately, any determination must be resolved as a question of law. (*People* v. *Skelton* (1980) 109 Cal.App.3d 691, 712-713 [167 Cal.Rptr. 636], cert. den., 450 U.S. 917 [67 L.Ed.2d 343, 101 S.Ct. 1361].)

Neither party cites, nor has our independent research revealed, a factually parallel California case. ■ A review of existing California case law offers no clear guidance as to what constitutes a security within the statutory meaning: The test generally employed by the California courts in assessing the elusive concept is the so-called "risk capital" test announced in *Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135]. "Section [25019] defines a security broadly to protect the public against spurious schemes, however ingeniously devised, to attract risk capital. . . . '[A]s a general rule, the sale of "securities" that is condemned by the courts involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money.' (Dahlquist, *Regulation and Civil Liability Under the California Securities Act, supra,* 33 Cal.L.Rev. 343, 360.) . . . . ■ [The] objective [of the Corporate Securities Law] is to afford those who risk their capital at least a fair chance of realizing their objectives." (*Id.,* at pp. 814-815; accord: *Fox* v. *Ehrmantraut* (1980) 28 Cal.3d 127, 138 [167 Cal.Rptr. 595, 615 P.2d 1383] [public sale of investment units to finance construction of subdivision held securities where the investors remained passive and were entitled to share in profits upon completion and sale of the project]; *Smith* v. *Sherman* (1962) 206 Cal.App.2d 93, 95 [23 Cal.Rptr. 487]; see also *People* v. *Park* (1978) 87 Cal.App.3d 550, 561-563 [151 Cal.Rptr. 146].)

■ The mere expectation of a return on an investment, together with the right of repayment, does not—without more—subject the transaction to security regulation. (*People* v. *Davenport, supra,* 13 Cal.2d 681, 690.) ■ But a public offering of *unsecured* promissory notes repayable with interest falls within the statutory purpose. Thus, in *People* v. *Walberg* (1968) 263 Cal.App.2d 286 [69 Cal.Rptr. 457] [officer of nonprofit religious corporation solicited funds at large for refurbishing a hotel to be used for missionary purposes], the court found the issued promissory notes to be securities despite the appearance of a loan transaction: "The Corporate Securities Act is designed to regulate the transactions by which promoters go to the public for risk capital." (*Id.,* at p. 294.) ■ However, a finding of inadequacy of collateral, in addition to the investors' dependency on the promoter's success for a return on the investment, will subject the superficial loan transaction to security regulation. (See *People* v. *Leach* (1930) 106 Cal.App. 442 [290 P. 131], app. dism., 283 U.S. 808 [75 L.Ed. 1427, 51 S.Ct. 646] [public sale of notes to develop subdivision, secured by lot parcels of small value] approved in *In re Leach* (1932) 215 Cal. 536, 546 [12 P.2d 3], app. dism., 287 U.S. 579 [77 L.Ed. 508, 53 S.Ct. 313].)

But where the investor receives adequate collateral, no risk capital is contributed to the managerial efforts of the promoter and such business transaction does not come within the Corporate Securities Law. (See *Hamilton Jewelers* v. *Department of Corporations, supra,* 37 Cal.App.3d 330.) In *Hamilton* the plaintiff promoted the sale of unmounted diamonds with a three-year guaranteed return and reimbursement plus interest. The court concluded that unlike earlier cases the diamond itself served as adequate security for the assured refund: "The fully secured status of the investor in Hamilton's promotional plan distinguishes this case from others where *unsecured* or *under*-secured promissory notes bearing fixed rates of interest have been held to be securities within the meaning of legislation similar to the Corporate Securities Law of 1968. (See *People* v. *Walberg* (1968) 263 Cal.App.2d 286, 294 [69 Cal.Rptr. 457]; *People* v. *Leach* (1930) 106 Cal.App. 442, 448-450 [290 P. 131], approved in *In re Leach* (1932) 215 Cal. 536, 546 [12 P.2d 3].)" (*Id.,* at p. 336.)

Here, the several lenders neither participated in the revenues earned by GSHL nor the profits, if any, made by the borrowers.[4] The return on their proportionate investments was limited to the stated interest due on the purchased notes secured by trust deeds; and no suggestion appears to have been made that the borrowers' equities were of a minimal magnitude amounting

---

[4]As noted earlier (*ante,* fn. 2), GSHL and/or defendant Schock apparently occupied a proprietory position in connection with the GSHL-Almar loan transaction. Since the parties fail to discuss the implications of that involvement, we attach no special significance to it herein.

to inadequate collateral. Although none of the transactions can be said to be "risk-free" in the sense of absolute safety from the ordinary risks of possible default, the investors' risk of loss appears small in relation to the security interest involved. ■ Clearly, the risk capital test does not convert every "risky" business loan or venture into a regulable security transaction. Nor are we persuaded by the People's argument that the fact of fractional interests in the trust deeds in proportion to the individual investments renders the collateral illusory since no investor retains actual control without agreement or adjudication of rights, of all the affected investors. While—as will appear—the circumstance of fractionalized interest is of substantial significance in the context of the promissory instruments used, there is nothing in the record to indicate that the several fractional interests were otherwise undersecured in terms of value.

■ Since the California Corporate Securities Law was patterned after the federal Securities Act of 1933 (15 U.S.C. § 77b), we may usefully consult federal decisions interpreting that Act in defining the term "security." (*Hamilton Jewelers* v. *Department of Corporations, supra,* 37 Cal.App.3d 330, 333.)

■ Beginning with the seminal case of *S.E.C.* v. *Howey Co.* (1946) 328 U.S. 293 [90 L.Ed. 1244, 66 S.Ct. 1100, 163 A.L.R. 1043], involving an investment contract, the test frequently used by federal courts is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." (*Id.,* at p. 301 [90 L.Ed. at p. 1251].) "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." (*United Housing Foundation, Inc.* v. *Forman* (1975) 421 U.S. 837, 852 [44 L.Ed.2d 621, 632, 95 S.Ct. 2051] [cooperative low income housing stock held not to be a security].)[5]

In *Los Angeles Tr. D. & M. Exch.* v. *Securities & Exch. Com'n* (9th Cir. 1960) 285 F.2d 162, cert. den. 366 U.S. 919 [6 L.Ed.2d 241, 81 S.Ct. 1095] (LATD), upon which the People rely, the defendant was engaged in a strikingly similar enterprise: investors' deposited funds were eventually used to purchase second deeds of trust; defendant's advertisements to prospective investors represented that they could rely on defendant to select a borrower, check the worth of the trust deeds and its established "policy" to repurchase any delinquent trust deed. In determining that the second trust

---

[5]See Deacon and Prendergast, *Defining a "Security" After the Forman Decision* (1980) 11 Pacific L.J. 213, 222, and Comment (1975) 6 Pacific L.J. 683, for an informative comparative analysis of the California and federal standards.

deed notes constituted securities, the court focused upon the economic realities involved rather than the form of the transaction: "We find 'a common enterprise' in which the appellants and the purchasers of second trust deed notes have an economic interest. We find that the economic welfare of the purchasers is inextricably woven with the ability of LATD to locate by the exercise of its independent judgment a sufficient number of discounted trust deeds, and the ability of LATD to subsequently meet its commitments, to check, evaluate, supervise, and supersede." (*Id.*, 285 F.2d at p. 172; see also *Securities and Exchange Com'n* v. *Lake Havasu Estates* (D.Minn. 1972) 340 F.Supp. 1318, 1321-1322 [defendant's screening and protection of investments in land sales contracts determined as securities].)

Similarly, in *United States* v. *Farris* (9th Cir. 1979) 614 F.2d 634, cert. den., 447 U.S. 926 [65 L.Ed.2d 1120, 100 S.Ct. 3022], the court found the sales of subdivision mortgage notes were securities, emphasizing the substantial services performed by the defendant for the investors: "[The defendant] not only agreed to act as a collection service on the notes, but it also promised to pay off the principal in cash at the noteholder's option should the lot buyer default. . . . [T]he noteholders have placed substantial trust in the management skill and solvency of [the defendant]." (*Id.*, 614 F.2d at p. 641; see also *Lingenfelter* v. *Title Ins. Co. of Minnesota* (D.Neb. 1977) 442 F.Supp. 981, 989.) The *Farris* court also underscored the presence of "a large offering to many unsophisticated purchasers, including widows, widowers, and the elderly; moreover, there was no access to [the defendant's] books for anyone but those in a small inner circle of the company." (*United States* v. *Farris, supra,* 614 F.2d at p. 641.)

The People argue—correctly, we think—that the GSHL transactions fit squarely within the federal test: specifically, that ordinary individual investors—many committing relatively modest sums—relied upon the skill, services and solvency of GSHL to protect their investments. GSHL selected the borrowers, provided collection services, agreed to advance funds to investors when borrowers were in arrears and bid on the property in a foreclosure sale.

Defendants' reliance on a line of decisions[6] employing the risk capital test in institutional commerce is misconceived. In those cases, the courts under-

---

[6]Notably, *Amfac Mtg. Corp.* v. *Arizona Mall of Tempe* (9th Cir. 1978) 583 F.2d 426; *Great Western Bank & Trust* v. *Kotz* (9th Cir. 1976) 532 F.2d 1252; and *United California Bank* v. *THC Financial Corp.* (9th Cir. 1977) 557 F.2d 1351. Almost none of the factual similarities obtain herein: the heterogeneous group of small individual investors possessed no real knowledge or control over the conduct of the borrowers selected, supervised and monitored by GSHL pursuant to the loan servicing agreement. The passive role occupied by the investors compelled full reliance on GSHL for the success or failure of the common enterprise. (Cf. *United States* v. *Carman* (9th Cir. 1978) 577 F.2d 556 [federally insured student loans with fixed rate of interest and repurchase clause held securities under the act].)

scored the extensive borrowers' investigation by the lenders, the term of the obligations, the relative size and purpose of the tailored loans, and the fact that the lenders were sophisticated financial institutions with the right to inspect periodically the borrowers' books and records.

Applying the federal standard to the facts and circumstances before us, we are compelled to conclude that the instruments involved herein constitute securities within the meaning of section 25019.

Our determination that the questioned instruments involved in the underlying transactions constitute regulable securities is strongly buttressed by analysis of the relevant statutory scheme.

In an apparent response to a 1954 opinion of the Attorney General that secured promissory notes [under former § 25102] offered for public sale are nonexempt securities requiring licensing of the seller as a "security broker" (24 Ops.Cal.Atty.Gen. 60 (1954)), the Legislature enacted former section 25102.1 (Stats. 1955, ch. 1792, § 2, p. 3306; repealed by Stats. 1961, ch. 886, § 34, p. 2344) exempting *a promissory note* secured by a lien on real property from the reach of corporate security regulations. But neither the former statute nor existing provisions have exempted a security transaction involving a promissory note which is *one of a series of notes.* At the time of the events in question, the Corporate Securities Law exempted a secured promissory note "which is not one of a series of notes secured by interests in the same real property." (Former § 25100, subd. (p).) By implication, a promissory note which *is* one of a series of notes secured by the same real property is not exempt and *is* a security.

Under parallel provisions of the Real Estate Law regulating real property security dealers (Bus. & Prof. Code, § 10237 et seq.), the definition of a real property security includes "An investment contract made in connection with the sale of a single promissory note secured . . . by . . . real property . . . ." (Bus. & Prof. Code, § 10237.1, subd. (a)) but does *not* include a note "which is one of a series of notes of equal priority secured by an interest in the same real property" (Bus. & Prof. Code, § 10237.1, final unnumbered paragraph).[7] Section 25100, subd. (p), amended effective August 25, 1982, as an urgency measure (Stats. 1982, ch. 564, §§ 1 and 6, pp. 2513, 2522), tracks the same language for an exempt security as follows: "A promissory note secured by a lien on real property, which is neither one of a series of notes of equal priority secured by interests in the

---

[7]Although recently amended in several immaterial particulars (Stats. 1982, ch. 854, § 3, p. 3199), the substance of the statutory provisions remains essentially unchanged.

same real property nor a note in which beneficial interests are sold to more than one person or one entity." (A companion amendment operative Jan. 1, 1984, deleted the word "one" before "entity." (Stats. 1982, ch. 1625, § 4.5, pp. 6580-6581.))

The exemption from corporate security regulations has been consistently limited to a *single* promissory note secured by real property traditionally within the jurisdictional supervision of the Real Estate Commissioner. (See § 25100, subd. (e) and Bus. & Prof. Code, § 10131, subd. (e).) A reasoned construction providing harmony among the related regulations evidences a legislative design that a secured transaction involving a series of promissory notes was intended to be governed under the Corporate Securities Law.

Here, although each transaction took the form of a single promissory note, *fractional* interests in each note and trust deed were assigned to each investor reflecting their undivided beneficial interests therein. Unmistakably, the fractionalizing process employed was no different in substance than the issuance of a *series* of notes secured by the *same* real property. (Cf. *McFaul v. Deck* (1939) 30 Cal.App.2d 424 [86 P.2d 890] [fractional interests in oil and gas sublease constituted securities].) Nor can there be any serious doubt that the 1982 amendment of subdivision (p) was intended to clarify that the longstanding exemption from corporate security law regulations did not extend either to notes of "equal priority" or to one "in which beneficial interests are sold to more than one person . . . ." (§ 25100, subd. (p).) ▪ Contrary to defendants' contention, such clarification did not create a new offense in contravention of the ex post facto clause. (See *People v. Sobiek* (1973) 30 Cal.App.3d 458, 472 [106 Cal.Rptr. 519, 82 A.L.R.3d 804], cert. den., 414 U.S. 855 [38 L.Ed.2d 104, 94 S.Ct. 155]; see also *Balen v. Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 828, fn. 8 [114 Cal.Rptr. 589, 523 P.2d 629].)

▪ Since the secured transactions under review are not accorded exempt status, they are by definition "securities" within the meaning of section 25019.[8] Thus, as regulated securities, the offer and sale thereof was subject to the qualification process and related penal sanctions for noncompliance.

---

[8]We reject defendants' insistent argument that the securities are somehow exempted as "real estate securities" within the purview of the Real Estate Law. As earlier discussed, the latter type of security subject to regulation by the Real Estate Commissioner is restricted to a single secured note and not one which is "one of a series of notes of equal priority." (Bus. & Prof. Code, § 10237.1.) To reiterate, the sale of serialized and secured equal priority notes—in whatever form—is *not* exempt from the class of regulated securities, a conclusion fortified by the recent amendment expressly denying exemption to a note in which "beneficial interests are sold to more than one person." (§ 25100, subd. (p).)

The order denying reinstatement of the complaint is reversed.

Elkington, J., concurred.

**NEWSOM, J.**—I concur in the majority's opinion, but hesitantly, and with reluctance.

I have had occasion previously to express misgivings about the propriety of predicating criminal charges carrying severe sanctions—felony conviction and state prison—on conduct which, not in itself wrong in any sense, is deemed criminal irrespective of the intent or knowledge with which it is done. (Cf. my dis. opn. in *Gonda* v. *Sullivan* (1982) 138 Cal.App.3d 774, 781 [188 Cal.Rptr. 295].)

I agree that the interests at issue here are probably securities—in part because, after careful assessment, we have said so. But what deeply concerns me is that, if we ourselves have such difficulty recognizing the character of these interests as securities, is it fair to bring criminal charges against those who failed or were unable to do so?

Convicting such persons of crimes on a "strict liability" basis seems to me not merely dubious, but wrong. Regrettably, our Supreme Court has not chosen to address this issue.

The petition of respondents Van Blaricom and Malone for a hearing by the Supreme Court was denied April 26, 1984. Mosk, J., was of the opinion that the petition should be granted.