[No. D005090. Fourth Dist., Div. One. June 29, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
MARVIN MILLER, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of section III.

1506

COUNSEL

Sheldon Sherman and Jerald W. Newton for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Sanford Feldman and Donald Canning, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WORK, Acting P. J.**— Marvin Miller appeals a judgment convicting him of nine counts of selling unregistered securities (Corp. Code,[2] § 25110) and eight counts of selling securities by false representations (§ 25401), each count involving losses greater than $100,000 (Pen. Code, § 12022.6, subd. (b)). He claims the prosecution is time-barred and, in any event, his real estate transactions were not subject to regulation by California's security laws.

I

On May 18, 1984, a *superior* court judge issued an arrest warrant on a complaint charging Miller with 19 counts of securities violations and 19 counts of grand theft involving the same loan transactions. Eight additional counts of felony tax violations were included. Four counts of grand theft allegedly occurred before May 18, 1984 (counts 1-4), but were found not to have been "discovered" for the purpose of triggering the statute of limitations[3] until after August 24 and September 3, 1981. Counts 5 through 38 involved theft and security crimes purportedly committed between May 22, 1981, and May 17, 1982, inclusive.

Miller waited until May 21, 1985 before moving to dismiss all grand theft and securities counts on the ground the three-year statute of limitations had then expired. His argument was based on the fact that Penal Code section 800, as it read at all applicable times, required either an indictment or issuance of an arrest warrant by a *municipal* or *justice* court judge to stop the limitations statute from running.[4] Because the May 18, 1984, arrest

---

[2] All statutory references are to the Corporations Code unless otherwise specified.

[3] Former Penal Code section 800, subdivision (c) (now § 803) tolled the statute of limitations on the grand theft and securities violations charged here until discovery. (See generally, *People* v. *Kronemeyer* (1987) 189 Cal.App.3d 314, 330 [234 Cal.Rptr. 442].)

[4] Former Penal Code section 800, subdivision (a) reads in part: "An indictment for any felony, except . . . shall be found, or an arrest warrant issued by the municipal or, where appro-

warrant was issued by a *superior* court judge, Miller argues it did not fulfill the statutory requirement. This contention was rejected first by a magistrate, then by the superior court, and finally this court when we denied Miller's petition for extraordinary writ. A petition for review of our decision was denied.

In an innovative plea bargain, Miller agreed to waive a jury trial on the securities counts and submit them to a court trial and to plead guilty to each grand theft count on condition he be allowed to withdraw those pleas if he prevails on the securities violations.[5]

## II

The charges evolved from a general scheme developed by longtime confidence operator, Miller.[6] Initially, he apparently convinced a real estate broker in the Palm Springs area he intended to purchase 20 homes, each in the million dollar range, to "fixup" and resell.[7] He then contacted an appraiser to prepare estimates on the homes he intended to buy, misrepresenting the value of the homes by falsifying the intended purchase prices. This appraiser's official estimates were grossly inflated, a fact attributed to his never before appraising luxury homes and the speed with which the estimates were required. For obvious reasons, Miller never told the appraiser his estimates were based on false information or were grossly excessive.

Miller presented the erroneous estimates along with falsified financial disclosure statements to Lochmiller Mortgage to secure separate loans for each home.[8] The homes were originally purchased by Bargain Books, Miller's own corporation. Some homes apparently were later refinanced.[9] Miller employed a series of double escrows to obfuscate his chicanery.

Lochmiller Mortgage never detected the documents Miller was presenting were fraudulent, until several transactions "soured," causing it to be-

---

priate, the justice court within three years after its commission." (Stats. 1982, ch. 583, § 1, p. 2544.) Penal Code section 804, subdivision (d) presently recognizes a prosecution is commenced when any arrest warrant is issued. (Stats. 1984, ch. 1270, § 2.)

[5] While this has some features of an attempt to obtain an advisory verdict, we choose not to explore this aspect because Miller has clearly placed himself in jeopardy. We note, however, the charged tax violations have not been resolved.

[6] The entire series of transactions follows the same pattern. The facts stated in this opinion reflect the overall pattern rather than the precise details which account for each security count.

[7] Miller was on federal probation and had concocted a lottery whereby these luxury homes would be used as prizes. He represented some of the proceeds would go to charity to satisfy probation conditions. This unlikely scam was frustrated by law enforcement intervention.

[8] It is unclear whether the homes were resold to Dart Industries (also owned by Miller), whether Bargain Books was resold to Dart or whether there was merely a rumor of a resale.

[9] Miller's scam was foisted upon a few other lenders before he discovered Lochmiller.

come insolvent and its investors to lose millions of dollars. Meanwhile, Stephen Lochmiller was involved in funding his mortgage company through which he made "equity" loans to Miller and others,[10] generating capital from passive investors whose interests were secured by fractional shares of real property trust deeds. Lochmiller solicited these investors and placed their funds in an investment pool until he approved a borrower. Lochmiller then determined the proportional interest each investor would have in each security and "serviced" the investors' accounts. Miller's wife, on behalf of Bargain Books, signed promissory notes and loan documents on which the names of the payees (and trust deed beneficiaries) were left blank, to be filled in later by Lochmiller. This was done by reference to lists of persons attached as exhibits setting forth multiple names and proportional interests. Thus, unlike some transactions discussed in *Leyva* v. *Superior Court* (1985) 164 Cal.App.3d 462 [210 Cal.Rptr. 545], Miller's notes were made payable directly to the publicly solicited investors.[11]

When Miller defaulted on the Lochmiller Mortgage loans, the properties were foreclosed by senior lien holders.

### III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### IV

Miller argues that even if his fractionalized promissory notes and trust deeds were securities subject to registration laws, he is not the person responsible for compliance. Instead, he contends the only person liable is Lochmiller whose public solicitation garnered the many investors to create his own investment pool. Miller claims it was Lochmiller on whom these lenders relied to place their money in profitable, secure loans and to service their accounts. Although substantial evidence shows Miller was aware he was not borrowing from Lochmiller Mortgage but that Lochmiller was merely brokering loans between Miller and available lenders, he claims it is only the person who directly solicits the public investors who is subject to the security laws. To support this proposition, Miller suggests the only reported similar cases relate to actions against the mortgage broker not the

---

[10]The parties stipulated Miller never personally met with the investors Lochmiller solicited, nor did he personally provide them with any information.

[11]In *Leyva,* members of the public were solicited to purchase promissory notes secured by assignments of fractionalized interests in real property deeds of trusts in which Burton and/or Burton interests were both trustor and beneficiary.

*See footnote, *ante,* page 1505.

borrower. (See *People* v. *Schock* (1984) 152 Cal.App.3d 379 [199 Cal.Rptr. 327]; *Leyva* v. *Superior Court, supra,* 164 Cal.App.3d at p. 462.) Even if this were accurate,[12] this circumstance is irrelevant under the facts we now address.

A security is statutorily defined as "any note; ... evidence of indebtedness; ... collateral trust certificate; ... investment contract; ... or, in general, any interest or instrument commonly known as a 'security' ...." (§ 25019.) Courts, however, consistently narrow the literal interpretation of this and equivalent statutes (see *Leyva* v. *Superior Court, supra,* 164 Cal.App.3d at p. 471; *People* v. *Schock, supra,* 152 Cal.App.3d at p. 385), instead defining what constitutes a security on an ad hoc basis depending on the relevant facts and circumstances in light of the regulatory purposes of the Corporate Securities Law (*Leyva* v. *Superior Court, supra,* 164 Cal.App.3d at p. 470). ██ The primary purpose of which is "to afford those who risk their capital at least a fair chance of realizing their objectives." (*People* v. *Schock, supra,* 152 Cal.App.3d at p. 385, citing Dahlquist, *Regulation and Civil Liability Under the California Securities Act* (1945) 33 Cal. L.Rev. 343, 360.) ██ Thus, in analyzing issuer transactions, California has established a "risk capital" test. This concept is derived from language in *Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 814 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135], which states: "Section 25008 defines a security broadly to protect the public against spurious schemes, however ingeniously devised, to attract risk capital ...." Particular documents meet the "risk capital" test when the money is raised for a business venture through indiscriminate offerings to members of the general public who have no control over the success of the venture and whose money is substantially undersecured. (*People* v. *Figueroa* (1986) 41 Cal.3d 714, 736 [224 Cal.Rptr. 719, 715 P.2d 680]; *People* v. *Schock, supra,* 152 Cal.App.3d at p. 385; *People* v. *Coster* (1984) 151 Cal.App.3d 1188, 1194 [199 Cal.Rptr. 253]; *Hamilton Jewelers* v. *Department of Corporations* (1974) 37 Cal.App.3d 330, 336 [112 Cal.Rptr. 387].)

██ Here, Miller was borrowing these monies for investment purposes. Although he was purchasing residences, they were but the bait for his grandiose illegal lottery scam. Because Miller had no means to pay these loans as they came due when his lottery was barred by the authorities, the only repayment possibility lay in his ability to resell these assets. However, the loans obtained by Miller were so far in excess of the value of the secured interests that no resale or foreclosure could recoup more than a few cents on the dollar to the individual lenders. Moreover, these investors were solicited

---

[12] In fact, Wayne Burton and his controlled entities (see fn. 11, *ante*) sometimes were the "borrowers" who issued the promissory notes directly to the investors. (See *Montoya* v. *McLeod* (1985) 176 Cal.App.3d 57, 61, 65 [221 Cal.Rptr. 353].)

from the general public and had no control over the success of the venture in which their money was placed. Clearly, Miller's notes and trust deeds are securities. (See *People* v. *Schock, supra,* 152 Cal.App.3d at pp. 385-387.)

Miller argues that it is only the success of Lochmiller's mortgage investment caper to which the investors looked and it is Lochmiller's control and managerial responsibilities that require him to comply with the Corporate Securities Law. However, the fact Lochmiller independently may be liable because he brokered these transactions and obtained commissions from the borrower, Miller, while charging fees for his managerial services to the investors, does not insulate Miller from liability for issuing his own unregistered securities. Section 25110 makes it unlawful to offer or sell nonexempt securities in an "issuer" transaction unless they have been legally qualified. An issuer is "any person who issues or proposes to issue any security." (§ 25010.) ■ A security includes a promissory note secured by fractionalized interests in real property. (*People* v. *Schock, supra,* 152 Cal.App.3d at p. 390.) ■ Here, Miller generated and circulated these notes to multiple investors in each transaction; that he brokered them through Lochmiller does not relieve him from the requirements of registration.

## V

■ Miller claims he cannot be responsible for any security violation because he was never in privity with his lenders. He relies on federal decisions which have incorporated a privity requirement to permit a purchaser of nonexempt unregistered securities to bring a *civil* action against the issuer. These cases follow the mandate of 15 United States Code section 771.[13] Thus, where an issuer sells the securities to an underwriter for resale, or distribution to the public for a price differentiation, in federal court, the purchaser is limited to a civil action against the immediate seller, underwriter. Miller cites no analogous California authority or cogent reason why the rationale of civil cases based on federal legislation should prevent California

---

[13] Section 771 of title 15, United States Code, provides as follows: "Any person who—(1) offers or sells a security in violation of section 77e of this title, or (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, *shall be liable to the person purchasing such security from him,* who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." (Italics added.)

from enforcing its *regulatory* statutes against those whose activities expose the public to the very type of scam involved here. In any event, Miller knew Lochmiller was soliciting funds from the general public and that multiple investors would receive fractional interests in the notes he issued. That's why he left the payee line blank as each note was executed. That Lochmiller acted as Miller's agent in securing these investors does not create any lack of privity here.

### DISPOSITION

Judgment affirmed.

Butler, J., and Todd, J., concurred.

A petition for a rehearing was denied July 24, 1987.